Mr. JUSTICE FRANK A. MONROE was appointed March 22, 1899, and took oath of office March 23, 1899.

---

### No. 12,637.

FRANCIS B. FLEITAS VS. CITY OF NEW ORLEANS; BOARD OF COMMISSIONERS, PORT OF NEW ORLEANS, VS. CITY OF NEW ORLEANS (CONSOLIDATED.)

#### SYLLABUS.

(1) Before a person can question the rights of others in respect to a certain subject matter he must have a legal interest therein himself.

(2) The property and property rights of a corporation are not destroyed by the expiration of its charter. (5th Ann. 741.)

(3) Act No. 70 of 1896 creating a Board of Commissioners for the port of New Orleans does not extend the powers of the board over the spaces occupied by the sheds erected thereon by the New Orleans Sugar Shed Company beyond those vested in the wharfingers prior to that Act.

ON APPEAL from the Civil District Court for the Parish of Orleans, *Rightor, J.*

W. S. Benedict, F. Rivers Richardson, G. A. Breaux, (O. B. Sansum of counsel), for Fleitas, Plaintiff and Appellant; *Bernard Mc-*

*Closkey* for Board of Commissioners, Plaintiff and Appellee; *Saml. L. Gilmore, City Attorney,* for the City of New Orleans, Defendant and Appellant.

*Carroll & Carroll, amici curiae.*

*Henry Chiapella,* Curator *ad hoc, Appellee.*

Argued and submitted March 9, 1898.
Opinion handed down November 27, 1898.
Rehearing refused January 9, 1899.

The opinion of the court was delivered by

NICHOLLS, C. J.   In the year 1869, under authority of an ordinance of the common council of the city of New Orleans, the mayor of that city entered into a contract with one Francis B. Fleitas, by which the city granted to the latter, on the terms and conditions fixed and declared in said contract "the exclusive right and privilege of using the public spaces in the Second District of New Orleans between Customhouse and St. Louis streets, commonly known as the Sugar Landing, for the purpose of erecting and constructing thereon fire proof sheds for the reception and shelter of sugar and molasses, with such arrangements for the transaction of business as might be necessary. The right and privilege were to commence from the first day of November, 1871.

The sheds were to be erected and kept in good order and repair by Fleitas, at his own cost, free of expense to the city.   Fleitas was to be allowed to charge certain designated rates for every hogshead of sugar and barrel of molasses sheltered under the sheds, and he was to pay to the city as a consideration for the privilege ten per cent. of the gross amount realized, and the revenues or income should not be subject to municipal taxation.   In addition to said consideration the

sheds at the expiration of the term of the privilege, were to be appraised at their cash valuation through a method provided for by the contract, and the city was to have the option of taking said sheds at one-half of said appraised value or of extending the privilege for the further period of fifteen years on the same terms, except that at the expiration of the fifteen years, the sheds were to revert to the city in full ownership free of all costs.

The contract provided that in case the city should fail or refuse to appoint an appraiser on its behalf within three months after the expiration of the twenty-five years, it should be considered as having exercised its option to extend the privilege.

The city guaranteed to Fleitas, his representatives, successors or assigns, during the term of the privilege and its extension, the undisturbed possession of the public spaces and the sheds thereon erected and that the landing for sugar and molasses should remain where it was at the time of the contract. That no other landing for sugar and molasses should be established or allowed and that no other privilege for the reception of sugar and molasses should be granted.

The contract provided that the wharfingers should have the right at any time when the levee was encumbered to enforce the then existing regulations and that the sheds should not be located nearer than one hundred and fifty feet to the wooden work or wharves then existing. The contract required that Fleitas should furnish security for the faithful execution of the obligation assumed by him, and that security was furnished by him as required.

On the 28th day of January, 1870, Francis B. Fleitas, associating with himself nine other persons (the sureties on his bond being among the number) organized, by act before Stringer, notary, for the period of twenty-five years, a corporation under the name of the "New Orleans Sugar Shed Company." The declared object of the company was "to construct and maintain sugar sheds in the city of New Orleans for the protection and shelter of sugar and molasses, and for exercising such powers and privileges as might be necessary for the business appertaining thereto and which had been or might be conferred on it."

The notarial act passed before Stringer was so framed as to evidence not only the organization of the "New Orleans Sugar Shed Company," but a contract between that corporation and Francis B. Fleitas.

By the "fifth article" of the act, the corporation declared that "it thereby assumed all the obligations of Francis B. Fleitas and his securities under the provisions of the ordinance of the city of New Orleans granting to Francis B. Fleitas, his representatives, successors and assigns, the right to have and enjoy for the period of twenty-five years, the exclusive right and privilege of using the public spaces on the levee in the Second District of the city between Customhouse and St. Louis streets, commonly known as the Sugar Landing, for the purpose of constructing thereon fireproof sheds for the reception of sugar and molasses within the time, and according to the plans and specifications of the city surveyor, and assumed all the obligations of the contract contained in the act before Castel, notary, between Francis B. Fleitas and the city of New Orleans, the corporation obligating itself to do and perform every obligation, thing and requirement in said ordinance and act of agreement contained, and to hold Fleitas and his securities harmless from all liability arising out of non-performance thereof.

On his part, Francis B. Fleitas, for the consideration declared in the act, declared that he agreed to, and did then transfer, assign, convey and abandon to the corporation, all the rights and privileges granted or ordained to him by the ordinance of the common council, and in the contract aforesaid, with all the franchises thereunto belonging or appertaining, to have, hold and enjoy the same, as fully, truly and entirely, as he, the said Fleitas, could or might have done had he retained the ownership and control thereof.

The Sugar Shed Company, by virtue of this act of transfer took possession of the spaces mentioned and erected at their expense the sheds thereon provided for by the ordinance of the city and the contract between it and Fleitas.

On or about the year 1882, a Pennsylvania corporation known as the "Louisiana Construction Company," having obtained a judgment against the city of New Orleans, seized in execution of its judgment the interest of the city in four spaces of ground (those involved in the present litigation), part of the public quay or levee, and in certain sugar sheds thereon, upon the theory that it was lawful for the city of New Orleans to withdraw the said spaces from the public and to make it private property while it was a *locus publicus,* and that the city by its contract of lease with Fleitas had so withdrawn the same as being no longer necessary for the public use. The city of New

Orleans enjoined the sale, claiming that the ground was *locus publicus*, and the grounds and sheds were, when seized, and long prior thereto, and were still exclusively devoted to public use, that is, to the purposes of commerce. The lower court dissolved the injunction and the city carried the case to the Supreme Court of the United States by writ of error.

The Supreme Court reversed the decree of the Circuit Court and remanded the cause, with directions to enter judgment for the city of New Orleans. New Orleans vs. Louisiana Construction Co., 140 U. S. 664.

In rendering its opinion the court said that two questions had been argued: 1st. Whether the city of New Orleans had power to dispose of the land so as to change its destination or character as *locus publicus*, and make the land its own private property; and second: whether the city had done so. That it abstained from expressing any opinion upon the first point because it was unnecessary for a decision of the cause, inasmuch as it was of the opinion that if the city had the power contended for, it had not exercised it. After setting out briefly the provisions of the city ordinance and of the contract to Fleitas, the court said: "Among the public uses for which the quay or levee was established, and to which it was devoted, was the landing of sugar and molasses brought by the Mississippi river to the port of New Orleans in the regular course of commerce and navigation. The real or declared purpose of the ordinance and of the lease was to secure the necessary shelter for the sugar and molasses so brought and landed. The various stipulations of the contract including the grant to the lessee of the exclusive use of the sheds and of the spaces under them, and the exclusive privilege of receiving and sheltering sugar and molasses at the port, were intended and adapted to accomplish that purpose with the greatest benefit to the public and with the least expense to the city. The shelter of the sugar and molasses was not a new and distinct use, nor in any sense, a private one, but was incidental to the principal use of landing those articles of commerce. The sheds for sheltering the goods were as subservient to the public use of the quay as the wharves for landing them.

The provisions requiring the lessee to erect the sheds "with such accommodations and conveniences for the transaction of business as may be necessary," and authorizing him to erect additional sheds in case those first erected "shall not be of sufficient capacity to meet the

demands of increased production or the requirements of commerce" as well as the provision defining and limiting the rates which he may charge for sheltering the goods, clearly show that he was to exercise a. *quasi* public employment, and was charged with the duty of accommodating the public like a wharfinger, a warehouseman or a common carrier and had no right to refuse to shelter to the reasonable capacity of the sheds, the sugar or molasses of any one applying to him and paying him the prescribed rates.

The city had not undertaken to alienate or sell the ground under the sheds, but has only leased it for a term of years, reverting at the end of that term with the sheds built thereon to the city, for the benefit of the public. The ground has no more ceased to be devoted to the public use by the making of the lease and the erection of the sheds than if the city had itself built and managed the sheds for the promotion of commerce and the benefit of the city and its inhabitants.

Moreover the use of the levee for the equally important public use of a highway is carefully guarded by the provisions that the sheds shall not be nearer than one hundred and fifty feet to the existing wharves, that the existing regulations against encumbering the levees, might be enforced by the wharfinger and that the city may extend existing streets or open new ones notwithstanding any privilege granted by the contract. Taking all the provisions of the lease together, the court declared it was of opinion that it in no way affected the character of the spaces in question as *locus publicus,* and that the city had no such private interest in those spaces, or in the sheds built upon them as could be seized and sold on execution for the debts of the city.

In 1896, the General Assembly of Louisiana enacted an act bearing the title of "An Act to establish a commission for the port of New Orleans, to define their powers and duties; to provide a revenue therefor and to repeal conflicting laws," being Act No. 70 of that year.

The provisions of the statute in question follow a preamble which declares that:

"Whereas the port of New Orleans has been gradually extended until it has reached beyond the limits and jurisdiction of the city of New Orleans; and

"Whereas the divided authority of three parishes and the multiplicity of officials with their various fees; and the development of

contiguous rival ports will act injuriously and prejudicially to the traffic of the port; and

"Whereas, the supervision and control of an intelligent Board of State Commissioners can consolidate the services of harbormasters and wardens, wharf superintendents, wharfingers of three parishes into one set of competent employees at a reduced expense; can operate and improve the wharves and other terminal facilities of the port and greatly develop and expand its commerce by removing many of the obstacles now placed in the way of its advancement, and

"Whereas due public notice of the intention to apply for the passage of the act had been given as required by Article 48 of the Constitution:

"Therefore, Be it enacted by the General Assembly of the State of Louisiana, That the Governor of the State of Louisiana is hereby authorized to appoint a board of commissioners to be known as the Board of Commissioners of the Port of New Orleans, etc."

By section 2 of the act it was enacted that the board of commissioners shall have power to regulate the commerce and traffic of the harbor of New Orleans in such manner as may, in their judgment, be best for its maintenance and development. They shall have and enjoy all the rights, powers and immunities incident to corporations. They shall be empowered, and it shall be their duty to take charge of and administer the public wharves of the port of New Orleans; to construct new wharves when necessary, and to erect sheds thereon to protect merchandise in transit, to place and keep the wharves, sheds, levees and approaches in good condition; to maintain sufficient depth of water and to provide for lighting and policing such wharves and sheds; to defray said expenses they shall charge upon the shipping visiting the port for the use of the wharves, etc., of the port of New Orleans, not exceeding one cent per net register ton per twenty-four hours (commencing at midnight just preceding the arrival of the vessel) for the first six days, provided the minimum charge on sea going vessels shall not be less than five dollars. Where sheds are provided by said board of commissioners, shipping using same shall pay an additional charge of one-half cent per net register ton for twenty-four hours (time to be calculated as above), said charge, however, in any case, not to exceed cost of construction, maintenance and management of said improvements, provided that nothing in this act shall apply to wharves owned by riparian proprietors, whether indi-

viduals, firms or corporations and maintained and used by the owner. or owners, or their lessees."

By section 4 it was enacted that all laws and ordinances regarding the appointment and fees governing harbor masters and wardens, wharfingers, wharf superintendents, and any and all laws in conflict with this act were thereby repealed, and the control and authority heretofore vested in them was there vested in the board of commissioners of the port of New Orleans who shall employ sufficient suitable persons to be known as deputy commissioners, not exceeding five, who shall under direction and supervision of the board perform the duties now devolving upon the harbor masters, masters and wardens, wharfingers, etc.

By the 9th section it was enacted that the "Board of Commissioners be authorized and empowered to acquire by purchase or by expropriation, the lease of the wharves now held by the Louisiana Construction and Improvement Company, and it is made the duty of the common council of New Orleans to provide for the payment of the price of such purchase or expropriation out of the funds under their control, provided that the price to be paid shall be satisfactory to said council."

By the 10th section it was enacted that all laws or parts of laws in conflict with the act be repealed.

On August 4th, 1896, the common council of New Orleans, reciting that the contract with Fleitas would expire on November 1st, 1896, authorized, by Ordinance No. 12,576, the mayor to appoint an appraiser on behalf of the city and to notify the New Orleans Sugar Shed Company to appoint an appraiser on its behalf to proceed to the fixing of a valuation upon the sugar sheds as provided for in the said contract between the city and Fleitas.

Appraisers appear to have been appointed by both parties, who, on the 12th January, 1897, fixed said value at one hundred and eighty-one thousand five hundred dollars.

On December 26th, 1896, the city of New Orleans, by Ordinance No. 12,991 C. S., directed the city comptroller to advertise for the sale at auction of the exclusive right and privilege for a term of fifteen years of using the public spaces on the levee in the Second District of New Orleans, between Customhouse and St. Louis streets, commonly known as the Sugar Landing, for the reception and shelter of sugar and molasses on terms and conditions declared in the ordinance.

By the 8th section of that ordinance, it was ordered that bids for the said privilege should be for so much for the entire term of the lease, payable annually in advance, during the said period of fifteen years—the successful bidder to pay to the city at the time the sheds are turned over to him the appraised value which the city has to pay the sugar shed company under Ordinance No. 1528 N. S., and the said amount should be considered as a payment in advance on the sum bid by him.

On January 27th, 1897, the board of commissioners for the port of New Orleans filed in the Civil District Court for the Parish of Orleans, a petition praying for an injunction, enjoining and restraining the city of New Orleans from offering for sale by virtue of Ordinance No. 12,991, the exclusive right and privilege for fifteen years of using the spaces on the levee known as the Sugar Landing, and from offering said squares or sugar sheds for sale or lease under any pretence whatever and praying for judgment decreeing said square to be dedicated for public use for the benefit of the commerce of the harbor and port of New Orleans, and that they are a part of the public quay of the said harbor and port, and that the lease of the city with Francis B. Fleitas or assigns in so far as the city of New Orleans was concerned, be declared terminated and that there was no option existing on behalf of said city to extend the same to Fleitas or assigns or to any other person or persons or corporation. They prayed for all such further relief as to the court might appear fit and proper in the premises. A preliminary injunction issued as prayed for. On the 27th January, 1897, Francis B. Fleitas filed a petition in the Civil District Court, in which he prayed that the city of New Orleans be enjoined from proceeding any further with the advertised sale of the privilege of the use public spaces known as the Sugar Landing. That the city of New Orleans and the New Orleans Sugar Shed Company (whose charter, he alleged, had expired, and had therefore ceased to exist as a corporation) be cited, the latter through a curator *ad hoc,* which he asked should be appointed to represent it; that after due proceedings there be judgment in his favor decreeing him the owner and entitled to all the rights, claims and privileges arising from and under the contract made by the city with him in 1869 and as further entitled to such judgment, either in cash value of the property involved or in the right of renewal as the court might ascertain to be correct and proper in the premises.

A preliminary injunction issued under the orders of the court based upon this petition, and Henry Chiapella was by the court appointed curator *ad hoc* to represent the New Orleans Sugar Shed Company.

The curator excepted, 1st: that the law did not authorize the appointment of a curator *ad hoc* to represent a defunct corporation, if said corporation was, in fact, defunct.

2nd. That there was no allegation that the New Orleans Sugar Shed Company was an absentee. Under benefit of these exceptions he pleaded the general issue.

The theory upon which the board of commissioners for the port of New Orleans based its demand and framed its petition, was upon the claim:

That the spaces upon which the sheds were constructed were part of the public quay, dedicated to public and of a *locus publicus* as had been declared by the Supreme Court of the United States.

That the contract between the city of New Orleans and Fleitas had expired.

That under the act of the Legislature creating the board of commissioners, the board was vested with the control and administration of the harbor of New Orleans, and of the port of New Orleans, and that the spaces aforesaid were part of said harbor and port dedicated to commerce, and for the benefit thereof and came on the expiration of the contract with Fleitas, within the scope of the duties and power of the board.

That the board was charged with the duty and right to regulate the commerce and traffic of the harbor of New Orleans, in such manner, as might, in their judgment be best for its maintenance and development.

That it was their duty of taking charge of, and administering the public wharves of the city of New Orleans—of constructing new wharves where necessary—of erecting sheds thereon to protec' merchandize in transit; of maintaining and keeping the wharves, sheds and levees and approaches in good condition, of maintaining a sufficient depth of water; of providing for lighting and policing said wharves and sheds—of defraying the expenses incurred for the purposes aforesaid, through certain charges upon the shipping visiting the port, for the use of the wharves, etc. That it was further their duty, to examine and investigate all questions relating to the interest

.of the port of New Orleans, and to regulate same, so far as it was in their power, under the statute creating the board.

That, notwithstanding said facts, the city of New Orleans had advertised for the sale at public auction for a term of fifteen years of the privilege of using said public spaces on the levee. That the commerce of the port was increasing and said spaces were necessary for the purposes thereof, and the proposed sale by the city to a private individual, or corporation, would result in irreparable injury to commerce and was in direct violation of law.

That the right to said squares should not be transferred exclusively to any individual or corporation, for any money consideration whatever, and that any transfer so made would defeat one of the objects of the creation of the board, to-wit: the granting of wharf and warehouse privileges for the protection of goods, wares and merchandise, at the rates designated in the act, which matter would be removed from them, and be vested exclusively in the purchaser, to the detriment of the general commerce of the city. That said spaces should be so regulated as not to grant exclusive privileges thereto, particularly for the period fixed in the advertisement.

That the city of New Orleans had derived no revenue from the contract with Fleitas.

That no option existed in favor of the city, by which it could extend and dispose of said spaces, for an indefinite period. That the passage of the act creating the board, divested the city of the power of extending the said lease—any property rights of the city having been divested by the termination of the option to extend the lease.

That the charter of the city prohibited it from making or renewing or extending any lease of the wharves, except, after thirty days' advertisement, and free competition and adjudication thereof by the comptroller to the highest or lowest bidder, as the case might be according as the specifications of the lease or sale might require, but that in violation of said provision, the city proposed to adjudicate the privilege, after twenty-seven days' advertisement.

The city of New Orleans, by way of answer, pleaded, first, the general denial, followed by special denials and admissions, and by affirmative allegations, in support of the action it had taken.

It admitted that the spaces referred to in which the sugar sheds were erected, were "part of the batture and public quay dedicated to public use, and were *loci publici*, but denied that the board of com-

missioners had any control or administration over said spaces or sugar sheds, and averred, the fact to be, that the control and administration of the same had, since the earliest period, been and continued still to be in the city of New Orleans, and remained unaffected by the act creating the board of commissioners of the port of New Orleans, and that said board was entirely without interest therein. It denied that the right to grant warehouse privileges for the protection of goods, wares and merchandise upon the batture or quay of the city, had been granted to the board of commissioners by Act No. 70 of 1896 (the act creating the board), or by any other law, or that such a grant was the object. It denied that the ordinance directing the sale, which had been enjoined, constituted an alienation of, or diversion from public use of any part of the batture or quay of the city in violation of any law, and averred, that it had for its object only the granting of a lease of said property on certain terms and conditions similar to those of the lease which had been approved by the Supreme Court of the United States in the 140th U. S. Reports. It averred, that it was authorized to make said grant or any other, not alienating or diverting said property from public use.

It admitted, that under the contract with Fleitas, it had the right to terminate the same, and to take all the improvements erected on the same, on the terms and conditions fixed in the contract, or to extend the privilege granted therein for the period of fifteen years, and that in case of the extension of the privilege, it had the right to take at the end of said extended period, in full ownership, and free of all costs, the improvements erected on the spaces. It averred, that it had taken the steps necessary, under said contract to terminate the same, and that it had the right at the date of the adoption of the ordinance directing the sale, and had still the right to make any contract with regard to said sheds, and the spaces occupied by them, for the temporary reception and shelter of goods, wares and merchandise in transit, as it might deem advisable and which would not constitute an alienation or diversion of said property from public use.

It averred, that if the effect of said Act No. 70 was such as that claimed for it by the board, viz: that the city of New Orleans was divested of its right to make contracts with reference to said sugar-sheds, or the spaces occupied by them, or divested of its right to obtain the revenues which it could obtain from said sheds, or the spaces occupied by them, or its right to the improvements thereon, the act would

be unconstitutional and void, for this to-wit: that it would violate Art. 156 of the Constitution, and section 10 of Art. 1 of the Constitution of the United States.

It prayed that the injunction which had been issued, be dissolved,. and that the city be decreed entitled to the full and exclusive right to control and administer all the batture or quay fronting the city, except the public wharves of the harbor of New Orleans.

Fleitas, in his petition, after setting forth the contract between the city and himself—the organization of the New Orleans Sugar Shed Company, and the contract between himself and that corporation, by which he transferred the rights held by him under the contract with the city, as declared in his act of transfer declared, that the Sugar Shed Company were entitled under this transfer to hold these rights "solely for the term of life of said corporation, which could not exceed twenty-five years."

He claimed that "at the expiration of the corporation, that is to say, twenty-five years after the 26th day of January, 1870, the rights. and powers of the Sugar Shed Company ceased and the contract reverted to him, Fleitas.

That he and his sureties were liable under the contract of the 18th of August, 1869, and might be sought to be made further liable and it was necessary that he should be protected in his rights of property and his sureties secured from further responsibility. That the city of New Orleans by an ordinance dated 6th August, 1896, had authorized the appointment of an appraiser as provided in the contract made by it with him in 1869, and had ordered that notification thereof should be given to the Sugar Shed Company.

That he (Fleitas) was the only person having power and authority to ascertain the cash value of the sheds and buildings and to treat and deal with the city as to whether the rights and privileges granted to petitioner should be extended for a further term of fifteen years following the first day of November, 1896, and he so notified the city.

That the city had no right or power to treat with any person or persons for the sale of said rights and privileges until the same shall have revested in said city by lapse of time and by payment of one-half of the value of said sheds and buildings to him (Fleitas); that any sale of said privileges which would be made before the 1st of February, 1897, would be contrary to the terms, tenor and effect of his. contract with the city and subject him to irreparable loss and damage..

That the city had by ordinance dated December 31st, 1896, after recognition of his (Fleitas') rights, claims, ownership and privilege, ordered advertisement for bids for the sale of such rights and privileges after fifteen days' notice with the expressed intent and object of disregarding his claims and paying the proceeds to the Sugar Shed Company, a person or thing non-existent in law.

That by the terms of said proposed auction sale the highest bidder was required to pay over and above the amount of his annual lease the sum of ninety thousand seven hundred and fifty dollars in cash, same to be credited upon the total amount of bid accepted.

That the proceedings and advertisement were *ultra vires*, would restrict public competition, and confine the bids to capitalists of large means, contrary to the letter and spirit of the contract and the laws governing the city of New Orleans and to his, Fleitas', great injury.

That he, Fleitas, duly named in writing, an appraiser, and notified the city, but said notice was held for naught, and disregarding same a figure of one hundred and eighty-one thousand five hundred dollars had been stated as being the appraisement made to which he was not a party nor a privy. That by reason of his reversionary interest in said contract after the expiration of the charter of the Sugar Shed Company, he was entitled to prevent the city from assuming or pretending to assume possession of the sugar sheds without having first legally made appraisement of the same and paid the price thereof in accordance with the contract of the 18th of August, 1869, a failure so to do operating an extension of the lease or franchise in his, Fleitas', favor, for the full term of fifteen years from the 1st of February, 1897. He prayed for citation to the city through the mayor and the Sugar Shed Company through a curator *ad hoc,* and for an injunction, and for judgment as hereinbefore stated. A preliminary injunction issued as prayed for. The city of New Orleans answered this demand by a general denial.

By consent the two cases were consolidated and tried together.

The District Court rendered judgment in favor of the board of commissioners of the port of New Orleans, and against the city of New Orleans, perpetuating the injunction issued at their instance on the 27th of January, 1897, prohibiting and restraining the city from offering for sale, by virtue of its ordinance, No. 12,091, the exclusive right for the term of fifteen years for use of the public spaces on the levee commonly known as the Sugar Landing, decreeing the same to

be dedicated to public use for the benefit of the commerce of the port and harbor of New Orleans, part of the public quay and as such under the administration and control of the board of commissioners of the port, and further decreeing that the city be enjoined perpetually and restrained from offering said sugar sheds for sale or lease, under any pretence.

The court further decreed the lease of the city of New Orleans with F. B. Fleitas or assigns, known as the Sugar Shed Company, to have terminated and that no option existed on behalf of the city to extend the same to said Fleitas or Sugar Shed Company, or any other person or persons or corporation. It further ordered that the suit of Francis. B. Fleitas be dismissed.

The city of New Orleans and Francis B. Fleitas appealed.

Fleitas having died before the cause was passed upon, his administrator made himself a party in the Supreme Court.

## OPINION.

The contract between the city of New Orleans and Francis B. Fleitas was assignable in character. Fleitas availed himself of that feature of the contract to transfer his rights under it to a corporation known as the New Orleans Sugar Shed Company, of which he and the sureties of his bond were organizers and at one time stockholders. The transfer might as well have been made to an individual as to a corporation and the Sugar Shed Company had as full legal capacity (after the assignment to it) to make a transfer itself to some other person or corporation, as Fleitas had.

The contract has to be considered and dealt with, in its entirety,. when considering its scope and effect. We cannot detach and wrench the portions of the contract looking to payment for the same either at the end of the term of twenty-five years or at the end of a prolonged term of fifteen years—those relating to the voluntary termination of the privileges at the end of twenty-five years by payment for improvements, or those relating to an extension of term resulting from either the voluntary exercise of the reserved right of option to extend or the compulsory extension provided for in the agreement; from those which precede these portions and view them as separate, distinct, independent provisions inserted for the sole use and benefit of Fleitas, the original holder of the franchise, and not enuring to the benefit of his assignee or subsequent assignees.

It is perfectly clear that had Fleitas transferred his contract rights.

to a natural person under precisely the same circumstances and on the same terms and conditions as he did to the Sugar Shed Company, and had the city been in condition at the expiration of the franchise at the end of twenty-five years, to make payment for the sheds at one-half of a valuation of the same then made, that the party entitled to receive this money would be the assignee who had erected the same, at his own expense. A claim that the amount should be paid over to Fleitas could not be entertained for a moment and we do not under-stand that Fleitas advances any such pretention. On the contrary, we understand him not only to concede that such transferree would be entitled to receive the money but to quote authority in support of that opinion.

If it be true that a natural person, being his transferree, would be entitled to payment, we do not see how it can be urged that a corpor-ation should occupy a different or less favorable position. The mere fact that the charter of the corporation may have expired prior to the expiration of the twenty-five year franchise would certainly not have the effect of vesting in Fleitas rights which he had disposed of in their entirety to some one else. Granting that the corporation by expira-tion of its charter had lost its rights under the contract the result of that fact, whatever it might be, would not be to re-invest Fleitas with privileges or rights with which he had absolutely parted.

The situation of affairs is easily made apparent by supposing that at the end of twelve years the Sugar Shed Company had itself trans-ferred all its rights to an individual or another corporation and its own charter had expired before the twenty-five years of the franchise had terminated, and considering what effect that fact would have upon the rights of the company's transferree.

Assuming as a fact that the Sugar Shed Company had ceased to exist as a corporation at the expiration of the term granted for the franchise, and that that company had not itself assigned at that time, its rights to any one—the right to compensation at the end of the twenty-five years for one-half of the value of the sheds which was a property right would not be extinguished by the death of the cor-poration as such. Granting that thereafter it was not clothed with the status of a legal corporation and could not pursue actively as such the business which it had previously followed, it could certainly go into liquidation and in such liquidation the amount due from the city for

the sheds would figure as an asset for distribution among the shareholders.

It is an error to suppose that the expiration of the charter of a corporation carries with it the destruction of the ownership of the property which the corporation held during its existence.

The Sugar Shed Company as a corporation, or its liquidators if the company were in liquidation, would be unquestionably entitled to receive from the city one-half of the appraised value of the sheds at the twenty-fifth year term of the contract if the city were in position to pay the amount to either the one or the other.

Fleitas, as transferrer of the franchise, has no concern or legal interest whether it should be paid to a corporation or to liquidators. The absence of legal interest in him on the subject matter would deprive him of all right of entering into any investigation of that question or of raising any issue as to whether the corporation were alive or dead.

For the same reason he would have no legal standing to question any arrangement which might be made between the city and the corporation, its shareholders or liquidators, in respect to either the mode or time of the payment of the sum due by the city. If the corporation or its stockholders, and the city by its agreement among themselves, were to modify the terms of the original contract and make special arrangements with each other on that subject, that would be a matter with which Fleitas would have nothing whatever to do, for by his transfer he has cut himself off from any connection with the contract.

The party entitled to the money would be the party to have control over that subject.

On the other hand if the original term of the franchise were to be extended either by the city availing itself of an option so so do, or by reason of a compulsory extension resulting from the existence of things from which by the terms of the contract such compulsory expulsion was made to follow, such extension would enure not to the benefit of Fleitas, but of the party who was entitled to have received the cash payment at the end of the twenty-five years had the city paid. The extensions would be simply the alternative method of settlement between the parties then in interest as provided for in the contract.

We do not view, however, the proposed future sale of the franchise for fifteen years as being made in the exercise of any option either

voluntary or enforced, stipulated in the contract. Both the city and the Sugar Shed Company have selected appraisers under the terms of the contract calling for an appraisement of the value of the sheds at the end of twenty-five years with the view of terminating the contract. The lease advertised to be made, if made, will not be an extension of the old, but an entirely new lease, the obvious object and purpose of which is to pay off the one-half of the appraised value of the sugar sheds, which is due to the Sugar Shed Company through a cash payment to that amount to be made upon his bid by the adjudicatee of the new lease. To that arrangement the Sugar Shed Company is evidently consenting. We do not see that Fleitas is interested in that matter, for he has not only transferred all of his rights under the contract with the city, but all the stock which he once had in the Sugar Shed Company, and a prolongation of the lease under the old contract would not affect him one way or the other. We think the judgment of the District Court dismissing Fleitas' demand correct and it is hereby affirmed.

We now direct our attention to the demand of the Commissioners of the Port of New Orleans.

The status of the river front below Canal street has been the subject of judicial examination not only in the case of New Orleans vs. Louisiana Construction Company (140 U. S. 664), but in that of the Mayor, Alderman and Inhabitants of New Orleans vs. The United States, reported in 10th Peters, 662.

In the latter case the Mayor of the city in pursuance of an ordinance of the City Council was about to advertise for sale in lots the vacant land included between Ursuline, Levee and Garrison streets, and the public road in the city of New Orleans and also the vacant land included between Customhouse and Levee streets, and the public road in that city when the sale was stayed by an injunction taken out by the Attorney General of the United States in behalf of the United States government on the ground that by the treaty of cession of the province of Louisiana by the French Republic to the United States, the latter succeeded to all the antecedent rights of France and Spain as they then were in and over said province; the dominion and possession thereof including all lands which were not private property; and that the dominion and possession of said vacant lands ever since the discovery and occupation of the said province of France remained vested in the sovereign, and had not at any time prior to the date of

said treaty been granted by the sovereign to the city. The prayer of the United States was that the City Council be restrained from selling the land or doing any other act which should invade the rightful dominion of the United States over said land or their possessions.

The city answered denying generally the allegations of the petition, and specially that the dominion and possession of the land at the time Louisiana was ceded to the United States were vested in either the king of Spain or the sovereign of France either as vacant land or under any other denomination. In a supplemental answer the city averred that the inhabitants of the city of New Orleans were the true and lawful proprietors of the vacant lots they had been enjoined not to sell.

First—Because all the space of ground existing between the front line of the houses of the city and the Mississippi river was left by the king of France, under the name of quays, for the use and benefit of the inhabitants of the city.

Second—Because if, since the foundation of the city, said space of ground became wider than was necessary for the public use and the quays of the city, it was in consequence of an increase formed by alluvion in the greatest part of the front of the city and the works which were necessarily made from time immemorial by the inhabitants of the city or at their expense to the levee in front thereof, to advance it nearer to the river than it was formerly.

Third—Because by the laws of Spain, which were in force at the time when said alluvions were formed and said works were made alluvions formed by rivers in front of cities, belonged to the inhabitants thereof who may dispose of the same as they think convenient on their leaving what was necessary to the public use, etc. The city further averred that the lands in question were of great value and could not be disposed of unless they should be indemnified by the government, etc.

The United States District Court perpetuated the injunction. On appeal to the Supreme Court of the United States, this judgment was reversed and the cause remanded with directions to dismiss the bill, stating that in deciding the case it was enough for the court to say that neither the fee of the land in controversy nor the right to regulate the use, was vested in the Federal government; that it was not necessary to pass on the right of the corporation to sell any part of the

common or to appropriate it in any other manner than as originally designated.

In the course of its opinion the court made a brief review of the facts connected with the early history of Louisiana, and of the city of New Orleans, in so far as they bore upon the question before it considering the case from the standpoint:

First—Of the rights of the appellants by the principles of the common law.

Second—Of their rights under the laws and usages of Spain and France.

Third—Of the interest of the United States in the property claimed. and their jurisdiction over it.

In respect to historical facts the court said:

"On the 26th of September, 1712, about thirty-eight years after Louisiana had been taken possession of by Lassalle, in the name of the king of France, a charter was granted by the king to Crozat, conferring on him exclusive rights for commercial and other purposes over a great extent of country which included the territory that now forms the State of Louisiana.

"The absolute property, in fee simple, was vested in him of all the lands he should cultivate, with all buildings, etc., he taking from the Governor and Intendant grants which were to become void on the land ceasing to be improved.

"The laws, edicts and ordinances, of the realm, and the custom of Paris were extended to Louisiana. This charter was afterward surrendered by Crozat to the king, and a new one was granted on the 6th of September, 1717, to a corporation styled the 'Western Company.' The land, coasts, harbors and islands in Louisiana, were granted to this company as they had been to Crozat, 'it doing faith and homage to the king and furnishing a crown of gold of the weight of thirty marks at each mutation of the sovereignty.'

"The power was given to this company to grant land allodially. And under its auspices the ground where the city of New Orleans now stands was selected as a place for the principal settlement of the province. A short time afterward the foundation of the city was laid by the construction of a few huts and other improvements. In 1724 and 1728, by the facts proved, it seems maps of the town were made on which the vacant space in controversy was designated by the name of quay.

"The Western Company continued to act under its charter until January, 1732, when, with the king's leave, the charter was surrendered and a retrocession was made by the company 'of the property, lordships and jurisdiction of Louisiana.'

"The town of New Orleans was established, and the plan, as designated in the maps referred to, adopted, while the county was under the jurisdiction of the Western Company, and the dedication to public use of the vacant space in contest was made by it so far as a dedication is shown by the plan and the indorsement of the word quay upon it. In the agreed facts a quay is admitted to be a vacant space between the first row of buildings and the water's edge, and is used for the reception of goods and merchandise imported or to be exported. In the Civil Code of Louisiana a quay is said to be 'common property to the use of which all the inhabitants of a city, and even strangers, are entitled in common, such as the streets and public walks.'

"The term is well understood in all commercial countries, and whilst there may be differences of opinion as to its definition, there can be little, or none, in regard to the popular and commercial signification of it. It designates a space of ground appropriated to the public use, such as the convenience of commerce requires.

"The entire space has been used for the purposes to which it was appropriated, with but occasional and slight interruptions to small portions of it, from the establishment of the designation of the quay until the present time (1836). The interruptions referred to were not such as deprived the public of the proper use of the ground. They were generally of a temporary nature, and were permitted where private accommodation was in some degree connected with the public convenience. Temporary shops and baths which were constructed upon this ground were of this character.

"The public established, at different times and for different purposes, buildings of a more permanent description, but they were rendered necessary for the public service, and they seem not to have encroached to any injurious extent on the public use of the quay. Some of those buildings have long since disappeared, and any of those which may still remain do not subject the city or the public to any inconvenience.

"The city authorities, at an early day, would scarcely be expected to object to the construction of barracks on this space for the accommo-

dation of the soldiers which were then stationed for the protection of the city. And much less would they be expected to object to the use of the common for the occasional performance of military evolutions. The customhouse and public warehouse erected on this ground by the Spanish government have disappeared, and the construction of the present customhouse on the quay by the Federal government, in 1819, can not be considered as affecting the original dedication. It might be convenient for the city to have the customhouse situated on this ground, and it does not interrupt the public use."

In view of all these facts, the court declared the first question to be answered was whether by the principles of the common law this vacant space had been shown to have been dedicated to public use, and answering the question said: "No one can doubt that the answer must be in the affirmative. The original dedication is proved by the maps in evidence and a public use of more than a century. These facts are conclusive. The right of the city is sanctioned by time and established by uncontroverted facts. No case of dedication to public use has been investigated by this court where the right has been so clearly established."

Having determined that the quay, as shown by the maps in question, was dedicated to public use during the existence of the charter of the Western Company, the court proceeded to examine the effect upon the fact of the surrender of that charter, the subsequent acquisition of the territory by the United States and by, finally, the creation of the State government. The conclusion reached by the court was that the retrocession of Louisiana to France by the Western Company did not abrogate the rights which had been acquired under it; that all grants to individuals, made by the company, were respected, and that there was no act of the French government, from the foundation of the city to the transfer of the country in 1769, which showed that this dedication was not as much respected by the king as were the grants to private citizens, and therefore the dedication to public use remained unaffected by the surrender of the charter. The court, however, declared that it could not be insisted that the dedication to public use, whether the title to the thing dedicated became vested in the city or its use only, could withdraw it from the political jurisdiction of the sovereign power. That this would place the property of this description on a higher and more sacred principle than private property; that in no point of view could this be the case.

Referring to the power of the sovereign the court declared that jurisdiction, to a limited extent, had been exercised by the king of France over the quays of France, and the public grounds of other cities in the kingdom, such as permitting buildings to be constructed thereon and regulating the manner and extent of such occupancy, but that this power seems to have been in the nature of a police regulation, and was so exercised as not incompatible with the public use of the grounds. That this authority, however, did not prove that the fee or right of use was not in the public, or that the king had power to convey the lands.

The court declared that when Louisiana, after the retrocession, was ceded by France to Spain, it was without any abridgement of the vested rights to property enjoyed by private individuals or communities. That the rights of the city of New Orleans were in no respect affected by this cession, unless they were affected later by the action of the Spanish laws thereon.

An examination of those laws satisfied the court, and it announced that the property having been dedicated to public use was withdrawn from commerce, and from the power of the king of Spain to alienate the same. That he had only a limited power over it, and that therefore the rights of parties remained unchanged under the Spanish rule. It declared that under the treaty of cession to the United States, Louisiana was ceded in full sovereignty, and in every respect, with all its rights and appurtenances as it was held by the Republic of France, and as it was received by that Republic from Spain.

That the State of Louisiana was admitted into the Union on the same footing as the original States. That her rights of sovereignty were the same, and by consequence no jurisdiction of the Federal government, either for the purposes of police or otherwise, could be exercised over the public ground. That it belonged to the local government to enforce the trust and to prevent what they should deem a violation of it by the city authorities.

In the course of its opinion the court extended its investigation to an examination of the rights of parties in respect to the alluvion which had formed in front of the quay or river line, and declared that the increase on the river front by alluvian formations partook of the same character, and was subject to the same use as the soil to which it became united.

There can be no question under this decision, that in 140 U. S. Rep. 662, and our decision in Duffy vs. The City, 49 An. 118, that the spaces in litigation are *loci publici* dedicated to public use and falling within certain limits under the jurisdiction and power, by virtue of its sovereignty, of the government of the State of Louisiana.

We do not understand the city to contest either of these propositions. It denies, however, that the General Assembly has, in point of fact, attempted to interfere with its (the city's) jurisdiction and power of control over the spaces, or over the contract in question, as claimed by the Board of Commissioners, but affirms that if it has so attempted to do, and to break up and destroy the rights and obligations which sprung out of the contract which the city made with Fleitas, without safeguarding it from the liabilities incurred by and entailed upon it by reason of the contract, the attempt would be null, void and unconstitutional. Whatever be the extent of the power of control of the State government over the river front of the city of New Orleans, the city has been permitted for many years to take charge of and administer the same free from State interference or participation with therein, except within narrow limits.

*Prior to the Act of 1896*, creating the Board of Commissioners of the port, there were three sets of officers exercising functions on the river front, namely: Harbormasters, Port Wardens and City Wharf Superintendents, Wharfinger, Contravention Clerks, Signal Officers and other employees. The Harbor Masters were State officers, appointed by the Governor, whose duties were defined by Art. 1681 of the Revised Statutes to have been:

"To regulate and station all vessels in the stream of the River Mississippi within the limits of the port of New Orleans, and at the levees thereof, and remove from time to time such vessels as are not employed in receiving and discharging their cargoes, to make room for such others as require to be more immediately accommodated, for the purpose of receiving and discharging their cargoes."

The Port Wardens were also State officers, appointed by the Governor, and their duties were defined by Act No. 3 of 1877, to have been:

"To inspect, when called upon by the master of any ship or vessel, when arriving from sea, the manner in which the hatches of ships or vessels were secured, previous to the opening of same for the purpose of discharging, and to certify the condition of the cargo in sight.

And to note marks, numbers and description, and location of all damaged goods so conveyed, the cause of damage, and the character of the damage and storage.

The Wharfinger, Wharf Superintendent, Contravention Clerk and Signal Officers, were appointed by the Commissioner of Public Works of the city, and their duties were connected with the administration and policing of the city's wharves, in connection with a contract of lease for the collection of the revenues from and maintenance of the wharves then existing, and still existing, between the city and a corporation known as the "Louisiana Construction Company."

At the time the city was exercising, in the manner indicated, its right and power of administration over the river front, the Legislature had, by Article 863 of the Civil Code, granted "to the corporations of cities, towns and other places, the right to construct on the public places, in the beds of rivers, and on their banks, all buildings and other works which might be necessary for public utility for the moving of vessels and the discharge of cargoes within their respective limits.

Under the provisions of this express authority the City Council of New Orleans made the contract with Fleitas, which is involved in the present litigation. It is not contended that that contract has ever been attacked, or been set aside either by judicial proceedings or legislative enactment. We do not understand the Board of Commissioners to advance a claim of that character, but to base their petition upon the theory that the original contract has come to an end by voluntary act of the parties, and that being ended the city has no power or authority to make a new lease. The board claims the right, as we understand, to take possession of the spaces upon the sugar landing occupied by the sheds, utilize the sheds upon them, fix the rates for storage thereunder, and receive the proceeds of storage, utterly unconcerned as to whether the sheds have been paid for, or what the situation might be of the Sugar Shed Company which erected the sheds at their own expense, under an express contract for either compensation at the termination of their contract, or for a prolongation of franchise for a period of fifteen years through the instrumentality of the benefits, of which prolonged lease the company was to receive payment, and also unconcerned as what the effect of such action might be upon the situation, and liabilities of the city under its contract.

In making the contract in question the City Council was not

diverting a public place to private use, or from the purposes of com-- merce. That point was incidentally alluded to in New Orleans vs. United States (10 Peters, 662), and squarely decided in New Orleans vs. La. Construction Co., (140 U. S. 662). The same principle is recognized by this court in 33 An. 566, Kline vs. The Parish of Ascension.

The city of New Orleans in the exercise of its undoubted right and power of judgment as to what was the best to be done in the interest of commerce, and the best means, method and place for accomplishing that result, reached the conclusion that shops erected at the outer edge of the sugar landing, not needed for the immediate discharge of freight, would enure to the interests of the parties interested in the receipt of sugar and molasses, and that it was right and proper that the particular persons availing themselves of the sheds should make such payment for the privileges as would enable the city to repay the cost of erection and maintenance. It is not pretended that such action when taken was not judicious, and in the best interests of commerce, nor that even at the present day it works injuriously to the same. Not provided with the necessary funds itself, the common council resorted to a contract through and by means of which the improvements could be put up, not in the interest of the parties with whom it contracted, though incidentally they might derive benefit therefrom, not for the purpose of speculation or money-making by the city, but with the object of securing the desired public improvement for the benefit of commerce.

The legality of making use of private individuals or corporations as public agencies in the accomplishment of public purposes, through special contracts, has been frequently recognized by the courts of the different States, notably in the case in the 140 U. S. 662, in respect to this very contract. As the court held in that case the Sugar Shed Company, the assignee of Fleitas, was a mere public agency forced to receive the sugar and molasses offered for storage at the rates fixed, and was not free to receive as it might think proper goods and merchandise of a different kind, or from parties not receiving them at the sugar landing, and the contractors were subject, within legally defined limits, to the power and control of the officers directly connected with the police of the landing and wharves. We do not understand that there will be any change in these respects under the sale of the franchise, which the Board of Commissioners has enjoined.

The Board of Commissioners, we imagine, would not have thought itself authorized to interfere any more with the contract between the city and the Sugar Shed Company, than to interfere with the contract between the city and the Construction Company, or the duties of the Orleans Levee Board, but for the fact that they consider the old contract with Fleitas ended, and a new and distinct one is about to be entered into, in respect to which they would occupy a different position from what they would do to the old.

It is very true that the sale enjoined contemplates a new lease, but in examining the situation we must not lose sight of the precise circumstances of the parties in regard to that subject. What would the situation be should the new lease be not made? Would not the old lease with Fleitas be forcedly continued for fifteen years with the right on the part of the lessee to exact a much heavier charge for the sugar and molasses under the sheds, than under the proposed new arrangement (the board, independently of other considerations, not being authorized to fix charges for storage under sheds of this character.) Was it not clearly in contemplation of the parties to the Fleitas contract, that its termination at the expiration of twenty-five years was to be conditioned upon the lessee then receiving payment of one-half of the estimated value at that time of the sheds, and such payment failing, that a prolongation of the lease for fifteen years should follow as a result? If that be true, would not the status of affairs, as fixed by the Fleitas contract, remain unaffected by the Act of 1896, except in unimportant particulars?

In what way would commerce or the public interest be advanced by such continuance? The Board of Commissioners would certainly not claim, under such circumstances, to be entitled to oust parties holding under the old contract, and to interfere with their existing vested rights. Their right of supervision and control over the sheds and spaces, if otherwise than just what they now are, would certainly not be those claimed by the board. We do not see the interest which the board has in the staying of the creation of a new lease at the expense of a continuance of the old, for the board is in error in supposing that the old lease has, as yet, in fact, expired.

The proposed new lease is evidently a modification of the Fleitas contract, by means of which the provisions as to payment of the value of the sheds is to be modified, evidently by mutual consent of the

parties to that contract. If that modification can be frustrated by the Board of Commissioners, these parties will fall back upon their original rights.

It is suggested that the advertisement of the proposed sale of franchise calls for too short a notice under the statutes governing such sale.

The length of time fixed for the advertisement of sale does not seem to have been fixed with the design of accomplishing any particular result, and the city expresses its perfect willingness to extend the time in a new advertisement. It is suggested that by the 9th clause of Ordinance No. 12,991, calling for the sale of the franchise, it is provided that at the expiration of the lease for fifteen years, "all the improvements shall revert to the city of New Orleans on a valuation to be ascertained by disinterested persons,-to be apppointed as provided for," and, therefore, the city after paying to the parties in interest under the Fleitas contract one-half of the value of the improvements made under the contract, would have also to pay to the new lessee for the same improvements.

In respect to this, counsel of the city, in their brief, say:

"This is error. Section 9, of Ordinance No. 12,991, as a matter of course, could only obligate the city to pay one-half of the value of the improvements placed on the squares by the new lessee. The section only refers to such improvements. The city, under the ordinance, could not, of course, be made to pay for property to which it would already have complete title."

The clause in question is very loosely drawn for a matter of such importance, and the ordinance should certainly be reformed in this respect so as to make matters clear and unmistakable.

The pleadings of the board do not attack the proposed lease on this score, and no argument has been made before the court as to whether they would have the legal right to urge objections of that character.

The taxpayers of the city are more concerned in that matter than the board. From the best consideration we have given this subject we are of the opinion that whatever might be the powers of the General Assembly over the subject matter, it did not, in enacting Act No. 70, of 1896, have in contemplation the spaces involved in this litigation, nor did it intend to make its provisions apply as claimed herein by the Board of Commissioners.

For the reasons herein assigned, it is hereby ordered, adjudged and

decreed, that the judgment of the Civil District Court, for the parish of Orleans, appealed from by the city of New Orleans, be and the same is hereby annulled, avoided and reversed; that the injunction which issued herein under the order of the said Civil District Court of January 27, 1897, on the petition of the Board of Commissioners for the port of New Orleans, be and the same is hereby dissolved and set aside, and the suit of said Board of Commissioners for the port of New Orleans be and the same is hereby dismissed.

JUSTICES MILLER AND BLANCHARD—We concur on the ground that the Dock Commission grant does not embrace the sugar sheds.