(33 South. 385.)

No. 14,247.

STATE ex rel. ILLINOIS CENT. R. CO. et al. v. BOARD OF LEVEE COM'RS OF ORLEANS LEVEE DIST.

(March 3, 1902.)

WHARVES—ERECTION—CONSENT OF AUTHORITIES.

1. The board of commissioners of the port of New Orleans, and not the common council of the city of New Orleans, is the legal body whose consent it is necessary for riparian proprietors to obtain, under article 290 of the constitution, as a condition precedent to their erecting wharves, buildings, and improvements on the batture or banks owned by them.

On Rehearing.

2. The words "council or other governing authority," made use of by article 290 of the constitution in designating the authority whose consent would have to be obtained by riparian owners desiring to build wharves on their front, are construed to have reference, not necessarily to the city or town council, or other body or functionary exercising the same functions as a council, but to whatever body or functionary is vested by the legislature with authority over the river front at the time that the consent is solicited; the power remaining in the legislature to transfer this authority at any time from one functionary to another.

3. In connection with private wharves built or to be built, this authority is confided for the time being in the city of New Orleans to the city council, and the council is the authority whose consent must be obtained by riparian owners desiring to build wharves on their front, under the provisions of article 290 of the constitution.

Nicholls, C. J., and Monroe, J., dissenting.

(Syllabus by the Court.)

Appeal from civil district court, parish of Orleans; George H. Théard, Judge.

Application by the state, on the relation of the Illinois Central and Yazoo & Mississippi Valley Railroad Companies, for a writ of mandamus to the board of levee commissioners of the Orleans levee district. Judgment for defendant, and relators appeal. The city of New Orleans and certain other parties intervene, and from the judgment the city of New Orleans also appeals. Reversed.

Foster, Milling, Godchaux & Saunders, Hunter C. Leake, Gustave Lemle, and Thomas H. Thorpe (J. M. Dickinson, of counsel), for appellant railroad companies. Samuel L. Gilmore, City Atty., for appellant city. Bernard McCloskey, for appellee board of levee commissioners. Dinkelspiel & Hart, for appellee board of commissioners of port of New Orleans.

Statement of the Case.

NICHOLLS, C. J. Pleadings in this case are long, and the issue is confined within narrow limits. The object of the proceedings in the district court by the relators was to compel the board of levee commissioners of the Orleans levee district by mandamus to grant or refuse, as required by article 290 of the constitution of 1898, their consent for the construction, maintenance, and operation by them of certain wharves, piers, docks, bulkheads, and other improvements fully detailed in a written application which was made to them to give such consent. In their petition they alleged that the board of levee commissioners had arbitrarily refused

to give such consent; that relators were entitled under said article 290 of the constitution to construct said wharves, etc., by reason of being riparian owners of the property along and in front of which they sought to be constructed, after obtaining the consent of the council or other governing authority in the city of New Orleans and of the board of levee commissioners; that they had obtained, as required by the cited article of the constitution, the consent of the common council of the city of New Orleans to the construction of the works on the terms and conditions imposed by the constitution.

Relators averred that it was the ministerial duty of the board of levee commissioners to give or refuse the consent applied for, and its action in the premises was unwarranted in law, arbitrary, and oppressive for the following, among other, reasons:

(1) That said board was not clothed with judicial functions, and is not charged by law with the interpretation of the constitution and laws of the state of Louisiana, in so far as they may relate to the jurisdiction of the council of the city of New Orleans or of the honorable board of commissioners of the port of New Orleans over the subject-matter of relator's said application, and is entirely without interest in such matters.

(2) That article 290 of the constitution does not, and did not intend to, extend the functions of the board of levee commissioners of the Orleans levee district beyond the duty delegated to said board by the laws existing at the date of the adoption of the constitution, namely, the duty of constructing, maintaining, guarding, and caring for the levees within the territorial limits of the parish of Orleans, and that the only duty incumbent upon said board, under article 290 of the constitution, was that of determining whether or not the wharves, docks, piers, bulkheads, and other improvements which relators desire to construct, maintain, and operate are of such a nature as to endanger, damage, or harm the levees at the points where said structures are sought to be erected, or to expose the inhabitants of the city of New Orleans to overflow or inundation.

(3) That article 290 of the constitution of the state of Louisiana is general in character, having reference to all cities and towns having a population of over 5,000, and that under the letter of said constitution relators must obtain the consent of the council of the city of New Orleans for the erection of their works; the words "or other governing authority" being used to cover those cities or towns where there are or may be no municipal councils.

(4) That the council of the city of New Orleans is the only "governing authority" "within whose municipal jurisdiction" relators' said squares of ground are located.

(5) That the council of the city of New Orleans is the only authority capable under the constitution and laws of the state of Louisiana of allowing the limited and conditional occupation and use by private persons of the portions of the river front lying before relators' said squares of ground, and lying before the streets intervening between said squares, until such time as the necessity for the public use contemplated by the constitution may arise.

(6) That the board of commissioners of the port of Orleans is entirely without jurisdiction of or interest in the subject-matter of the application made by relators, for the following, among other reasons, to wit:

(a) That section 2 of act No. 70 of 1896 only empowers and makes it the duty of said board "to take charge of and administer the public wharves of the port of New Orleans"; that section 2 of Act No. 36 of 1900 only empowers and makes it the duty of said board "to take charge of and administer the public wharves and landings of the port of New Orleans"; and that the wharves, docks, piers, bulkheads, and other improvements which relators desire to construct and maintain are not to be of such character, but are to be part of relators' terminal facilities, subject, under article 290 of the constitution, to expropriation "whenever necessary for public purposes," upon reimbursement to relators of the "cost of construction," less such depreciation as may have resulted from time and decay,—such reimbursement, however, "in no case to exceed the actual market value of the property."

(b) That, in adopting Act No. 70 of 1896 and Act No. 36 of 1900, the legislature took notice of, considered, and acted with regard to, as appears by said acts, a then existing lease of public wharves and landings of the city of New Orleans, wherein the public

wharves and landings of the city of New Orleans were in detail defined and specified, and that the wharves and other structures proposed to be erected by relators are to be, and relators' said six squares of ground are, outside and beyond the limits of the public wharves and landings so defined and specified.

(c) That by the express terms of section 2 of Act No. 70 of 1896, establishing the commission for the port of New Orleans and defining its powers and duties, it is provided "that nothing in this act shall apply to wharves owned by riparian proprietors, whether individuals, firms or corporations, and maintained and used by the owner or owners or their lessees"; and that by the express terms of section 2 of Act No. 36 of 1900, amending and re-enacting certain sections of Act No. 70 of 1896, it is provided that "nothing in this act shall apply to wharves, owned by riparian proprietors, already constructed or hereafter constructed in accordance with provisions of article 290 of the constitution, whether individuals, firms or corporations, and maintained and used by the owner or owners or lessees."

(d) That the board of commissioners of the port of New Orleans is not a "governing authority," and is not a "governing authority" "within whose municipal jurisdiction the wharves, buildings, and improvements desired by relators are to be erected."

(e) That the board of commissioners of the port of New Orleans is merely an administrative body, legally incapable of making or allowing the limited and conditional occupation and use by private persons of the portions of the river front lying before relators' said squares of ground, or lying before the streets intervening between said squares, until such time as the necessity for the public use contemplated by the constitution may arise.

Relators further averred that they were without adequate relief in the premises by the ordinary processes of law, and that they were entitled to the issuance herein of a writ of mandamus directed to the board of levee commissioners of the Orleans levee district, ordering and commanding said board to grant or refuse the consent applied for by relators as herein above set forth and alleged.

Relators annexed to their petition the following answer made by the board of levee commissioners to the application made to them to grant their consent to the construction of the works.

"Board of Commissioners Orleans
'Levee District,
"New Orleans, October 19, 1901.
"Hunter C. Leake, General Agent I. C. R. R. Co.—Dear Sir: At a meeting of this board held on the 16th inst. the special committee to whom your petition of Aug. 16th, 1901, asking authority to build a bulkhead and wharf in front of your property in the 6th Dist., was referred, handed in their report, which we regret to say was adverse to granting your request, because the attorney of the board held the opinion that, before the petition would be in proper shape to come before this board, it should first be acted upon by the port commission.

"The report was unanimously adopted.
"Very respectfully,
"[Signed] Orleans Levee Board,
"T. J. Duggan, Secy."

The board of levee commissioners, in answer to the rule served upon it, made return as follows:

(1) That it was not informed of the full and complete ownership in plaintiffs to the property described as six squares of ground in the Sixth district of the city of New Orleans, between General Taylor and Austerlitz streets, Austerlitz and Constantinople streets, Constantinople and Marengo streets, Marengo and Milan streets, Milan and Berlin streets, and Berlin street and Napoleon avenue,—all of said squares being bounded on the side toward Lake Ponchartrain by Water street, and on the other side by the Mississippi river,—together with all rights of accretion and batture and any and all other riparian rights; but, on the contrary, it denied that relators were the full and complete owners of the property in question, with any right to accretion or batture, or to any riparian right whatever.

(2) Respondent denied that it was necessary for relators, in order to perform their duty and conduct their business as common carrier, and handle with safety and dispatch a great and rapidly increasing export and import trade between the city of New Orleans and state of Louisiana and other cities

and states of the United States and foreign countries, alleged to have been induced, built up, and encouraged by the efforts of relators, to construct upon said squares of ground elevators, warehouses, and other buildings, or to construct, maintain, or operate upon the banks of the river Mississippi in front of said squares of ground, or in front of the streets intervening between said squares, wharves, docks, piers, bulkheads, or other alleged improvements, at an expense alleged to exceed $1,000,000; but, on the contrary, respondents denied that the improvements contemplated were as stated by relators, or that same were necessary to aid their handling with safety and dispatch the export and import trade as alleged.

(3) Respondent denied that the wharves, docks, piers, bulkheads, and other alleged improvements upon the banks of the river Mississippi, which relators desired to construct, maintain, and operate, were necessary and essential to enable relators to properly transact and carry on their business as common carriers in the city of New Orleans, or to retain for said city the export and import traffic referred to.

(4) Respondent admitted the provisions of article 290 of the constitution of the state of Louisiana, but alleged that said article had not been and was not fully and completely set forth in relators' application herein, but, on the contrary, a large and pertinent part thereof had been omitted; and respondent reserved the right to read, incorporate, and make part of this return said article 290 in its entirety.

(5) Respondent admitted that relators applied to the council of the city of New Orleans, a city of a population exceeding 5,000, for permission to construct, maintain, and operate certain wharves, docks, piers, bulkheads, etc., and which was more fully set forth in the copy of the ordinance annexed to relators' petition; but respondent specially denied that the consent required by law under article 290 of the constitution was obtained by relators, or that Ordinance No. 822, N. C. S., adopted August 6, 1901, approved August 19, 1901, was binding upon respondent, because same was passed in direct violation of the constitution and laws of this state, as hereinafter more particularly set forth.

It is admitted that relators made application to respondent within whose levee district the property was situated; but, from their application it appeared that relators construed the "governing authority" in the premises to be the city council of the city of New Orleans, and had made application thereto, resulting in Ordinance No. 822, N. C. S., heretofore referred to. But respondent averred and believed that under the constitution of the state of Louisiana of the year 1898 the "governing authority" referred to therein is the board of commissioners for the port of New Orleans, and none other; that the interpretation placed by said relators upon said constitution was contrary to law, and in direct violation of the letter and spirit of said constitution and laws upon the subject-matter, which constitution and laws respondents had sworn to obey; that neither the allegations of said petition of August 16, 1901, nor the prayer thereof, demanded such relief as was sought by the writ of mandamus herein, but that, notwithstanding, respondent believed and averred, and still believed, that the "governing authority" of the port and harbor of New Orleans was not the city council of said city, but was the board of commissioners of the port of New Orleans; that it was respondent's duty to take cognizance of the law of this state, and to uphold, and not ignore, same, and specially the law as laid down in said article 290 of the constitution, which regulates partially the duties and obligations upon the respondent board.

And respondent specially denied that the interpretation as placed upon said article by the said relators could or did govern respondent in its interpretation thereof, or could be made the means to legally influence respondent's duty to support, uphold, and obey the unambiguous mandates of the constitution and laws of this state.

(6) Respondent denied that the duty imposed upon it was simply ministerial, as set forth in relators' petition, but, on the contrary, alleged and stated that under article 290 of the constitution and the laws of this state respondent was invested with the right to determine the public policy in passing upon such applications, or in the refusing or granting of the same; that the public policy of the state was set forth in said article 290

of the constitution, which was adopted in furtherance of and agreeably to the deliverance and reasons of the supreme court of the state of Louisiana, in the case of Louisiana Const. & Imp. Co. v. Illinois Cent. R. Co., 49 La. Ann., at pages 528 et seq., 21 South. 891, 37 L. R. A. 661, wherein and whereby the grant now known as the "Stuyvesant Docks" was declared to be illegal, null, and void, and beyond the power and authority of the city council of New Orleans to grant; and that said constitutional restriction, known as article 290 of the constitution of 1898, was written with the intent and purpose of restraining and restricting the powers of riparian proprietors within designated municipalities, including the city of New Orleans, to acquire rights as set forth by relators to the river front or banks of navigable streams, without qualification or restriction, for whatever purpose, without first submitting same to the "governing authority,"—the public policy of the grant requested or sought,—which "governing authority" is said board of commissioners for the port of New Orleans, and none other; that the duty imposed upon respondent was not a ministerial duty, but it was a legal discretion, vested by the sovereign power in this respondent and in the said board of commissioners for the port of New Orleans to determine same.

(b) Respondent alleged that article 290 of the constitution did intend to extend, and did extend, the functions of the respondent board beyond the laws in force at the date of the adoption of said constitution, namely, the duty of constructing, maintaining, guarding, and caring for the levees within the territorial limits of the parish of Orleans, and denied that the only duty incumbent upon said respondent board under article 290 of the constitution was that of determination whether or not the wharves, docks, piers, bulkheads, and other alleged improvements which relators desired to construct, maintain, and operate were of such a nature as to endanger, damage, or harm the levees at the points where said structures were sought to be erected, or to expose the inhabitants of the city of New Orleans to overflow or inundation.

(c) That article 290 of the constitution of the state of Louisiana had reference to the board of commissioners of the port of New Orleans in the use of the words "governing authority," because respondent averred that by act 136 of 1898 all cities having a population exceeding 5,000 inhabitants were required to have, and do have, municipal councils, and that no city existed in this state of over 5,000 inhabitants, except the city of New Orleans, where any other governing authority existed than such municipal council, and respondent averred that there was no city of over 5,000 inhabitants situated upon the banks of any navigable stream within this state, except said city of New Orleans, whose topography, natural situation, or increasing commerce ever induced the legislature to provide for by the creation of a governing authority as part of the sovereign power as set forth in Act No. 70 of 1896, Act No. 36 of 1900, and article 290 of the constitution of 1898, except as aforesaid,—said city of New Orleans.

(d) Respondent denied that said city council of the city of New Orleans had any governing authority within the contemplation of said article, or any authority as alleged by relators.

(e) Respondent denied that the council of the city of New Orleans was the only authority capable under the constitution and laws of the state of Louisiana of allowing the limited and constitutional occupation and use by private persons of the portions of the river front lying before relators' said squares of ground, and lying before the streets intervening between said squares, until such time as the necessity for the public use contemplated by the constitution may arise; but, on the contrary, respondent averred that said city council had no authority at all, and that every authority was alone vested in such regard in the board of commissioners of the port of New Orleans.

(7) Respondent averred that the grounds set forth in article 6 of petitioner's application for mandamus, and subsections (a), (b), (c), (d), and (e) thereof, were legal conclusions only, and, in so far as the facts therein stated were inconsistent with the facts as stated in this return, respondent specifically denied same.

But respondent averred that said legal con-

clusions were based upon false premises and illogical deduction, and were the interpretation merely of said relators.

Respondent averred that section 2 of Act No. 70 of 1896 empowered the board of port commissioners to take charge and administer the port and harbor of New Orleans in its entirety, and not as set forth in the limited constructions contended for by relator; that in said act of 1896 and the amendatory act of 1900 the legislature took notice of the port and harbor of the city of New Orleans as an entirety, and as extending beyond the municipal boundaries of the city of New Orleans, in that coextensive jurisdiction in the parishes of St. Bernard and of Jefferson, on both sides of the river Mississippi, was vested in said board of port commissioners, and was coextensive with the port of New Orleans as defined by the Revised Statutes of the United States.

Respondent denied that the power and jurisdiction of the board of port commissioners did not apply to wharves owned by riparian proprietors, whether individuals, firms, or corporations, and maintained and used by the owner or owners or their lessees, but, on the contrary, especially averred that no restriction of any kind or character was imposed upon said board of port commissioners, where, in their discretion, the public interests demand their intervention; and specially did they aver that under section 2 of Act No. 36 of 1900 no wharves could be hereafter constructed, except in accordance with the provisions of article 290 of the constitution, which makes it a condition precedent that the board of commissioners of the port of New Orleans consent to such construction.

Respondent denied that the board of commissioners of the port of New Orleans was not the governing authority within whose jurisdiction the wharves and buildings desired by relators were to be erected.

Respondent denied that the board of commissioners of the port of New Orleans was merely an administrative body, incapable of allowing or granting the limited and conditional occupation and use by private persons of the portions of the river front; but respondent averred, on the contrary, that said board of commissioners of the port of New Orleans was the only governing authority in such regard.

The city of New Orleans intervened in the case. It averred that under and by virtue of the provisions of article 290 of the constitution of the state of Louisiana, and other articles of said constitution, petitioner was vested with power and authority to make all grants, to riparian owners of property on navigable rivers, lakes, or streams within petitioner's municipal jurisdiction, of privileges or rights to erect and maintain on the batture or banks owned by said riparian owners such wharves, buildings, and other improvements as might be required for the purposes of commerce and navigation, subject to the conditions imposed by said article 290 of the constitution, and had power and authority to grant to private persons the use and occupation of portions of the river front between the front property line and the waters of the Mississippi river until such time as the necessity for the public use of such portions of the river front shall arise.

Petitioner further averred that in the exercise of said power and authority petitioner granted, under the provisions of article 290 of the constitution, to the plaintiffs in the above entitled and numbered suit, by Ordinance No. 822, N. C. S., adopted August 6, 1901, and approved August 9, 1901, a certain conditional privilege of constructing, maintaining, and operating wharves, docks, piers, bulkheads, and other improvements, on the banks of the river Mississippi, in front of six squares of ground owned by said petitioners and fully described in the petition herein, and in front of the streets intervening between said squares of ground, which said conditional privileges more fully and at large appeared from a duly certified copy of said Ordinance No. 822, N. C. S., which was hereunto annexed and made a part hereof.

Petitioner further averred that it was its duty to maintain at all times, judicially and otherwise, all power and authority conferred upon it by the constitution, and laws of the state of Louisiana, and that it was particularly its duty to maintain its power and authority over all territory within its municipal jurisdiction and under its governmental control.

Petitioner further averred that the grant made by it by Ordinance No. 822, N. C. S., was legally and properly granted, and was in accordance with article 290 of the constitu-

tion; that the six squares of ground owned by petitioners in the above entitled and numbered suit, the space between the front lines of said squares and the river, and the space between the front lines of the streets intervening between said squares and the river, was territory within petitioner's municipal jurisdiction, and that petitioner had a right to intervene in this cause for the purpose of upholding its power and authority over the subject-matter of said Ordinance No. 822, N. O. S., and of asking a decree of this court recognizing petitioner's said power and authority, and declaring said Ordinance No. 822, N. O. S., a valid and legal ordinance.

In view of the premises, petitioner prayed leave to file this petition of intervention; that the relators and the defendant herein be cited to appear and answer the same; and that, after all due proceedings had, there be judgment in favor of petitioner recognizing petitioner's power and authority over the granting of privileges under article 290 of the constitution, and decreeing Ordinance No. 822, N. O. S., legal and valid, and for general relief.

The board of commissioners of the port of New Orleans intervened in the case. It averred that it had an interest in this controversy, and desired to intervene for the protection of this interest, for the following reasons, to wit:

(1) That it was the governing authority, referred to in article 290 of the constitution of Louisiana of 1898, within whose jurisdiction would be the wharves, buildings, and other improvements set forth in the petition of the relators.

(2) That under the act creating the board of commissioners of the port of New Orleans, being Act No. 70 of 1896, the control of said board was over the entire port of New Orleans, irrespective of the question as to whether wharves were actually built thereon when said board was created or not.

(3) That, before the defendant in this cause could be called upon to act in the manner and form prayed for by relators, interveners must first give their consent to the erection of the wharves and other buildings desired by relators, and that until said consent was given the defendant in the case was without interest or power to act.

That for the foregoing reasons interveners alleged that the petition of relators discloses no cause of action; and, having no information or knowledge of the various matters and things set up in said petition as facts, they denied all and singular the allegations of said petition.

They prayed for leave to file this petition of intervention; that same might be served on the plaintiffs and the defendant, and they be duly cited to appear and answer same; and that in due course of law there be judgment herein maintaining this intervention and rejecting the demand of the relators, at their costs, and for general relief.

The district court rendered judgment in favor of defendant and the board of commissioners for the port of New Orleans, intervener, refusing the writ of mandamus prayed for and rejecting the demand of relators, the Illinois Central and Yazoo & Mississippi Valley Railroad Companies, and of intervener the city of New Orleans, without prejudice, however, to the right of relators to renew their said demand when they shall have obtained from the board of commissioners for the port of New Orleans its consent to the construction, maintenance, and operation by relators of wharves, docks, piers, bulkheads, and other improvements on the banks of the Mississippi river as set forth in their petition herein; costs of these proceedings to be paid by relators and the city of New Orleans.

Relators appealed.

## Opinion.

The statement accompanying this opinion gives in detail the respective claims and pretensions of the parties to this litigation. They are concisely given in the brief filed on behalf of the plaintiff as follows:

"This was a proceeding by mandamus to compel the board of commissioners of the Orleans levee district to act, by granting or refusing, on the application of the petitioning railroad companies for the consent of the board to their use of the river banks for wharves, sheds, bulkheads, etc., in front of petitioners' property fronting the Mississippi river, between Napoleon avenue and General Taylor street in the city of New Orleans; the consent of the council of said city to such use having been previously asked and granted by ordinance, and the levee board com-

missioners having refused to act until the consent of the board of commissioners of the port of New Orleans had been first obtained. The position of the levee board was, and is, that the board of commissioners of the port of New Orleans is the 'governing authority,' designated by article 290 of the constitution of 1898, whose consent to the use of the river bank in question must precede action on the part of the levee board. This position was specifically taken by the latter board in its return to the alternative writ of mandamus.

"The board of commissioners of the port of New Orleans intervened, and assumed the same position as that asserted by the levee board.

"The city of New Orleans also intervened, asserting the city council to be the 'governing authority,' mentioned by the constitutional article, 'within whose municipal jurisdiction such wharves, etc., are to be erected,' whose consent was necessary, and sufficient, in addition to action by the levee board.

"The court below refused to make the mandamus peremptory, reserving to petitioners the right to renew their application after having obtained the consent of the board of commissioners of the port of New Orleans to the desired use of the river bank; thus holding that board to be the 'governing authority' within whose municipal jurisdiction such wharves, etc., are to be erected, intended by article 290 of the constitution. From that ruling this appeal is prosecuted."

Article 290 of the constitution of 1898, to which all parties refer, is as follows:

"Riparian owners of property on navigable rivers, lakes and streams, within any city or town in this state having a population in excess of five thousand, shall have the right to erect and maintain on the batture or banks owned by them, such wharves, buildings and improvements as may be required for the purposes of commerce and navigation, subject to the following conditions, to wit: Such owners shall first obtain the consent of the council, or other governing authority, and of the board of levee commissioners, within whose municipal or levee district jurisdiction such wharves, buildings and improvements are to be erected, and, such consent having been obtained, shall erect the same in conformity to plans and specifications which

shall have been first submitted to, and approved by, the engineer of such council, or other governing authority; and, when so erected, such wharves, buildings, and improvements shall be, and remain, subject to the administration and control of such council, or other governing authority with respect to their maintenance and to the fees and charges to be exacted for their use by the public, whenever any fee or charge is authorized to be and is made, and shall be, and remain subject to the control of such board of levee commissioners, in so far as may be necessary for the maintenance and administration of the levees in its jurisdiction. The council, or other governing authority, shall have the right to expropriate such wharves, buildings, and improvements, whenever necessary for public purposes, upon reimbursing the owner the cost of construction, less such depreciation as may have resulted from time and decay; such reimbursement, however in no case to exceed the actual market value of the property: provided, that nothing in this article shall be construed as affecting the right of the state, or of any political subdivision thereof, or of the several boards of levee commissioners to appropriate without compensation such wharves, buildings, and improvements when necessary for levee purposes.

"The grants made by the city of New Orleans under the terms of Ordinance 11,765, Council Series, adopted January 14, authorizing the construction, use, and maintenance of wharves, structures, and improvements upon riparian property in the Sixth municipal district, and other grants of the same nature made by the city of New Orleans to riparian owners with reference to their property, are recognized as necessary aids to the commerce of this state, and are hereby ratified, and declared to be lawful, but shall in no event be construed as conferring greater privileges or rights than might be conferred under this article, or as releasing the riparian owners from the obligations herein imposed or which may have been imposed upon or assumed by such riparian owner by contract, municipal ordinance or otherwise."

All parties to this litigation concede that the rights, privileges, claims, duties, and obligations which are herein asserted are to be tested by article 290 of the constitution of

109 LA.—14

1898, and such legislation of the state as is necessary to be considered in giving to it the force and scope the convention intended.

The very character of this suit is a recognition by the plaintiff that, whatever may have been in the past or whatever may be at present its rights as a riparian proprietor, they are now subordinated as to their exercise by the requirements of the article of the constitution cited.

And so, whatever may have been in the past the power, jurisdiction, and authority conferred by the general assembly of the state upon the city of New Orleans in respect to the river front and to the lands lying behind the same, they must be made to yield to the will of the sovereign as it has found expression in the same article.

There can be no question as to the power of control of the state to some extent over the river front and the lands back of the same for the purposes of commerce and navigation, and in the interests of the general public. It is not necessary to enter into any discussion here as to the extent of that power.

In Fleitas v. City of New Orleans, 51 La. Ann. 24, 24 South. 623, this court referring to the decision of the supreme court of the United States in City of New Orleans v. U. S., 10 Pet. 662, 9 L. Ed. 573, said: "There can be no doubt, under this decision, that in City of New Orleans v. Louisiana Const. Co., 140 U. S. 654, 11 Sup. Ct. 968, 35 L. Ed. 556, and our own decision in Duffy v. City of New Orleans, 49 La. Ann. 118, 21 South. 179, that the spaces in question are loci publici, dedicated to public use and falling, within certain limits, under the jurisdiction and power, by virtue of its sovereignty, of the state of Louisiana."

This power of control exists for the purposes stated, not only as affecting the rights and privileges of individuals and private corporations owning riparian lands, but also as affecting those of the municipal corporations themselves as owners of such lands within their borders.

They stand quoad these lands, for the purposes stated, as do individual owners and private corporations, subject to the exercise of the state's rights of sovereignty.

We are not confronted in this case, as we were in the Fleitas Case, with the rights of third parties which had arisen by reason of contracts made by them with the city of New Orleans, while the latter, by permission of the state, was exercising powers of administration over the river front. The city of New Orleans, in its discussion of the matters now before the court, deals with its past actions in this matter as having been exercised in its own corporate right as a municipal corporation, separate and distinct from the position which it occupied quoad hoc as a state governmental agency, either by express or implied authority.

In this it is entirely mistaken. The general assembly, and still less the state, has never abdicated its rights over the subject-matter, nor conferred upon the city a perpetual vested right, under and by virtue of which the latter was substituted for the legislature or the state in dealing with it. The powers of the city, exercised by it either under inaction or acquiescence of the general assembly by its direct authority, were merely temporary and administrative, and could be withdrawn at any time, subject, at most, to the state's observing contract rights which had accrued prior to its resumption of authority. The language of Mr. Justice Field in Illinois Cent. R. Co. v. State of Illinois, 13 Sup. Ct. 110, 36 L. Ed. 1018, in respect to a grant by the general assembly to a private corporation, is equally applicable to a perpetual grant of authority to, and abdication of its own authority to, a municipal corporation. He said:

"In the administration of government, the use of such powers may for a limited period be delegated to a municipal corporation or other body; but there always remains with the state the right to revoke these powers, and exercise them in a more direct manner and one more conformable to its wishes. So with trusts connected with public property or property of special kind, like lands under navigable waters, they cannot be placed beyond the direction and control of the state.

"The harbor of Chicago is of immense value to the people of the state of Illinois in the facilities it affords to its vast and constantly increasing commerce, and the idea that its legislation can deprive the state of control over its bed and waters, and place the same in the hands of a private corpora-

tion created for a different purpose, one limited to transportation of passengers and freight between distant lands and the city, is a proposition that cannot be defended. * * * It is hardly conceivable that the legislature can devest the state of the control and management of this harbor and vest it absolutely in a private corporation. Surely an act of the legislature transferring the title to its submerged lands and the power claimed by the railroad company to a foreign state or nation would be repudiated, without hesitation, as a gross perversion of the trust over the property under which it is held.

"So would a similar transfer to a corporation of another state. It would not be listened to that the control and management of the harbor of that great city, a subject of concern to the whole people of the state, should be placed elsewhere than in the state itself. All the objections which can be urged to such attempted transfer may be urged to a transfer to a private corporation, like the railroad company in this case. Any grant of this kind is necessarily revocable, and the exercise of the trust of the state can be resumed at any time. Undoubtedly there may be expenses in improvements made under a grant which the state ought to pay; but, be that as it may, the power to resume the trust whenever the state judges best we think incontrovertible. The position advanced by the railroad company in support of its claims to the ownership of the submerged lands, and the right to the erection of wharves, piers, and docks, at its pleasure, or for its business in the harbor of Chicago, would place every harbor in the country at the mercy of a majority of the legislature of the state in which the harbor is situated. We cannot, it is true, cite any authority where a grant of this kind has been held invalid; for we believe that no instance exists where the harbor of a great city has been allowed to pass into the control of any private corporation. But the decisions are numerous which declare that such property is held by the state, by virtue of its sovereignty, in trust for the public. The ownership of the navigable waters of the harbor and of the land under them is a subject of public concern to the whole people of the state. The trust with which they are held,

therefore, is governmental, and cannot be alienated, except in those instances mentioned of parcels used in the improvement of the interest thus held, or where parcels can be disposed of without detriment to the public interest in the lands and waters remaining.

"This follows necessarily from the public character of the property being held by the whole people for purposes in which the whole people are interested."

What is here said of an attempted transfer by the general assembly of the ownership of lands finds equal application to a perpetual abdication by the legislature of its right and power and control over the harbor by transfer of the same to a municipal corporation, either acting in its own right as a corporation or by power of attorney with an interest which cannot be revoked.

There can be no question as to the right and power of the state to have assumed or reassumed its powers of control and sovereignty over the harbor and port of New Orleans. The question before us is whether it has done so or not.

The argument made in this case in favor of the right and power of the city of New Orleans to deal with this subject, viewed exclusively from the interest of that city as a municipal corporation, subordinating or losing sight entirely of any duty or obligation on its part to deal with it from the standpoint of the interests of the general public as a state agency, indicates the wisdom of not permitting the two interests to center in the same hand, making it possible for the city in her corporate interests to ignore or sink those of the state acting in trust for the general public. It is perfectly manifest that the interests involved in this matter cover a much broader ground that those of the corporations of New Orleans. The people of the whole state—in fact, of the whole country— are concerned in this subject.

There is no doubt that for a great many years the authorities of the city of New Orleans were utilized for the purposes of administering matters connected with the harbor of New Orleans. In the Fleitas Case we said that, "whatever be the extent of the power of control of the state government over the river front of the city of New Orleans, the city has been permitted for many

years to take charge of it, free from state interference or participation therein, except within narrow limits."

In 1896. however, the general assembly took action in this matter by the enactment of Act No. 70 of that year, and later, in 1900, there was additional legislation on the same subject by Act No. 36 of 1900.

Upon those two acts, and the connection and bearing which they have upon the provisions of article 290 of the constitution, the decision of this case rests.

The first of these acts (Act No. 70) was entitled "An act to establish a commission for the port of New Orleans, to define their powers and duties, to provide a revenue therefor, and to repeal conflicting laws."

The act was preceded by the following preamble: "Whereas, the port of New Orleans has been gradually extended until it has reached beyond the limits of the city of New Orleans;

"Whereas, the divided authority of three parishes and the multiplicity of officials, with their various fees, and the development of contiguous rival ports, will act injuriously, and prejudicially to the traffic of the port;

"Whereas, the tax on shipping exacted for various fees, charges, etc., is of such proportions as to threaten to divert the trade to less expensive ports; and

"Whereas, the supervision and control of an intelligent board of state commissioners can consolidate the services of harbor masters and wardens, wharf superintendents, and wharfingers of three parishes into one set of competent employés at a reduced expense, can operate and improve the wharves and other terminal facilities of the port, and greatly develop and expand its commerce by removing many of the obstacles now placed in the way of its advancement:

"Therefore,

"Section 1. Be it enacted," etc., "that the governor of the state is hereby authorized to appoint a board of commissioners to be known as the 'Board of Commissioners of the Port of New Orleans,' said board to consist of five members, who shall be citizens of the United States and reside within the port limits of New Orleans, in the parishes of Orleans, Jefferson, or St. Bernard, and at the time of their appointment must be prominently identified with the commerce or business interests of the port of New Orleans."

By the second section of the act it was declared "that the board of commissioners shall have power to regulate the commerce and traffic of the harbor of New Orleans in such manner as in their judgment be best for its maintenance and development. They shall have and enjoy all the rights, powers and immunities incident to corporations. They shall be empowered and it shall be their duty to take charge of and administer the public wharves of the port of New Orleans, to construct new wharves where necessary and to erect sheds thereon, to protect and keep the wharves, sheds, levees and approaches in good condition, to maintain sufficient depth of water, and to provide for lighting and policing such wharves and sheds. To defray said expenses they shall charge upon the shipping visiting the port for the use of wharves, etc., of the port of New Orleans, not exceeding one per cent. register ton per twenty-four hours (commencing at midnight just preceding the arrival of the vessel) for the first six days: provided the minimum charge on sea-going vessels shall not be less than $5.00. Where sheds are provided by said board of commissioners, shipping using same shall pay an additional charge of ½ per cent. per net register ton for 24 hours (time to be calculated same as above), said charge, however, in any case not to exceed cost of construction, maintenance and management of said improvements: provided that nothing in this act shall apply to wharves owned by riparian proprietors whether individuals, firms, or corporations and maintained and used by the owner or owners or their lessees."

By the third section it was declared that, "should the income within the maximum rates herein authorized be more than sufficient to carry out the duties of the commission, they shall make said charges conform to the necessary expenditures. Should the total amount paid by any vessel reach 6 cents per net ton under the first paragraph of section 2, the vessel shall not be liable for any further sum, until after she has remained at the wharf thirty days. The charges on barges, steamboats, and other river crafts shall be carefully calculated by the commissioners, and the reduction on same shall accord with the charges on sea going vessels."

By the fourth section it was declared that "all laws and ordinances regarding the appointment and fees governing harbor masters and wardens, wharfingers, and wharf superintendents, and any and all laws in conflict with this act, are hereby repealed, and the authority and control heretofore vested in them is hereby vested in the board of commissioners of the port of New Orleans, who shall employ sufficient suitable persons, to be known as deputy commissioners, not exceeding five, who shall, under direction and supervision of the board, perform the duties now devolving upon the harbor masters, wardens, wharfingers," etc.

The fifth section authorized the board to make certain charges upon vessels for the maintenance and support of the deputy commissioners.

The sixth section authorized the appointment of a superintendent and fixed his salary.

The seventh section declared that it should be the duty of the board of commissioners to examine and investigate all questions relating to the port of New Orleans, to regulate same as far as it is in their power under this act or as hereafter amended, and to annually make a printed, classified report to the governor of the state of all receipts and disbursements, the number of arrivals and departures of vessels and crafts, the exports and imports, merchandise, etc., and on the general management of the business of the port and the condition of the improvements.

The eighth section provided for the time of the meetings of the board and authorized it to prescribe rates to govern its meetings and to employ the necessary clerical and other force, etc.

The ninth section authorized and empowered the board to acquire by purchase or by expropriation the lease of the wharves held by the Louisiana Construction & Improvement Company, and made it the duty of the common council of the city of New Orleans to provide for the payment of the price of such purchase or expropriation out of the funds under their control, provided the price to be paid should be satisfactory to the council.

The tenth section declared that all laws or parts of laws in conflict with the act were thereby repealed.

Act No. 36 of 1900 amended sections 2, 3, 4, 5, 8, and 9 of Act No. 70 of 1896. Most of the amendments were as to matters of detail, having no bearing upon the issues in the present litigation.

The second section was amended so as to read that the board should have power to regulate the commerce and traffic of the port and harbor of New Orleans, instead of simply the harbor of New Orleans, and added the words "and landings" after the word "wharves," wherever that word occurred.

It extended the proviso at the end of the section, so as to make it read: "Nothing in the act shall apply to wharves owned by riparian proprietors already constructed or hereafter constructed in accordance with provision of article 290 of the constitution, whether individuals, firms or corporations, and maintained and used by the owner or owners or lessees."

The ninth section extended the power of the board, so as to authorize it to acquire by purchase or expropriation the lease of the wharves held by the Louisiana Construction & Improvement Company, or of any other wharves or landings, and made it the duty of the common council, as before, to provide for the payment of the price. A new clause or paragraph was added to the section by which it was declared that "said commission shall have the power to expropriate any property, wharves or landings necessary to be expropriated for the benefit of the commerce of the port and harbor of New Orleans, in accordance with the expropriation laws of the state."

The first words which attract attention in article 290 of the constitution are those which declare that "the wharves, buildings and improvements" which riparian proprietors shall have the right under the provisions of that article to erect are such "as may be required for the purposes of commerce and navigation." The next words are those which require as a condition precedent to the erection of these works the consent of the common council "or other governing authority." It is the presence of these last words, "or other governing authority," in the first part of the article, and repeated therein several times afterwards, which has given rise to the controversy. The Illinois Central Railroad Company and the city of

New Orleans insist that those words were inserted in the article simply because the municipal authorities of the different cities and towns in the state were not designated as "the common council" of the cities and towns, but under different titles, such as "Board of Trustees," etc. The board of levee commissioners of the port and harbor of New Orleans maintain and contend that they were inserted specially and particularly to constitute the board of commissioners of the port and harbor of New Orleans that whose prior consent had to be obtained.

Following the article down to where these two expressions are subsequently found therein, we find that, when these works are erected, such wharves, buildings, and improvements shall be and remain subject to the administration and control of such council or other governing authority with respect to their maintenance and to the fees and charges to be exacted for their use by the public whenever any fee or charge is authorized to be made and is made. We find, also, that "the council or other governing authority shall have the right to expropriate such wharves and buildings whenever necessary for public purposes."

Turning, now, to the acts of the general assembly creating the board of commissioners of the port of New Orleans, the first noticeable feature is that it is expressly made a "state agency" and representing the state's interests, and through it the interests of the general public, as contradistinguished from the special interests of the corporation of New Orleans. It will be seen that the subject-matter with which the board is made to deal is one not only extending over territory within the limits of the city, but extending besides over the territory of Jefferson and St. Bernard parishes; that it has to deal with the interests of commerce and navigation as a whole throughout the port, not with reference to a particular port thereof; that one of the objects of its creation was to guard against the development of contiguous rival ports and the building up of one portion of the front of the port and harbor at the expense of the other ports. The declared object of the creation of the board was to operate and improve the wharves and other terminal facilities, not of the city, but of the port, "and greatly expand and develop its commerce by removing many of the obstacles then placed in the way of its advancement," and that this object was sought to be obtained, it was recited, by an appointment of an intelligent board, not of city, but of state, commissioners, who were not only given "supervision," but "control," of the matters with which they were to deal. It was made their duty, and they were empowered, to regulate the commerce and traffic of the port and harbor of New Orleans in such manner as might, in their judgment (not in the judgment of the city council), be best for its maintenance and development, and it was made their duty to investigate and examine all questions relating to the interest of the port of New Orleans, and to regulate the same as far as it was in their power, under the act creating it or as afterwards to be amended. It was authorized and empowered to construct new wharves wherever necessary and to regulate and fix fees and charges. How is it possible for it to discharge and carry out the duties imposed upon it when it might be thwarted at every step by the action of a body independent of itself acting within the territory of its jurisdiction upon identical questions? Take, for instance, the question of the erection of new wharves. The board, in the exercise of its undoubted powers on that subject, reaches the conclusion that, while it would be desirable to build a new wharf at some particular point, it would be more advantageous to postpone action for a time, and do so on its own terms, than to permit some wealthy riparian proprietor to build one at once at great expense, making the condition of the board's obtaining control for the public the reimbursing to him of the cost of its construction. It determines to postpone matters for a time, when the announcement is made that the common council has reached a conclusion different from its own and granted permission to do that which in the exercise of its own judgment was not judicious, but ill-advised. A conflict of jurisdiction, power, and authority, and a clash of interests, would instantly arise. This result could not have been intended. That the governing authority in the article of the constitution is not, in New Orleans, the council of the city, is evident from the fact that, after the erection of the wharves, they are to remain subject to the administration and control of the

council or other governing authority with respect to their maintenance and to the fees and charges to be fixed. The council in New Orleans is not the body under the law charged with the administration and maintenance of the wharves, nor is it charged with the duty of regulating and fixing fees. On the contrary, the board of commissioners of the port of New Orleans is the body expressly charged by law with the performance of these duties.

In addition to what has been said, it will be noticed that in Act No. 70 of 1896, creating the board of commissioners of the port, in it, and not the city, was vested a right of expropriation; and this same power was again recognized as being vested in the board in the act of 1900, which was enacted after the adoption of the constitution. In this latter act two bodies are referred to directly and separately, and dealt with in respect to that matter. The right of expropriation was enlarged, and upon the board was thrown the duty and responsibility of determining what expropriation of property was necessary for the purposes of commerce and navigation, and, having done so, to take legal steps for such expropriation. The declaration, made in the seventh section of Act No. 70 of 1896, that the board was to regulate the matters with which they were intrusted, as far as it was in their power to do so under that act or as afterwards amended, referred evidently to the fact that the action of the board was then hampered by a lease of the wharves which the city had entered into with a corporation known as the "Louisiana Construction & Improvement Company."

Counsel argue that there are certain duties and rights in respect to the river front originally conferred upon them of which they have not been in terms devested, and therefore the board of commissioners of the port to that extent is not fully the governing authority. It may be true that the lawmakers have left uncovered by statute a portion of the city's original authority in some respects; but, whatever those powers may be, they do not have the effect of making the council the body authorized by the constitution to give its consent to riparian proprietors as required by article 290. On the other hand, whatever powers the board of commissioners of the port may have, or whatever it may

lack, it cannot be denied that it has had affirmatively and directly conferred upon it, and granted by the constitution itself, this particular power.

We cannot agree with counsel that the words "or other governing authority" were inserted in article 290 of the constitution to cover the cases of cities and towns in which the legislative body of the town or city was designated by some other title than "Common Council." Those words of themselves would have clearly enough shown the intention of the convention. Had it thought that term ambiguous or uncertain, it would certainly have used the general term "municipal authorities." The words "or other governing authority" are unusual words, and evidently referred to some special case wherein there was a special condition of affairs, and that special case was evidently that of the city of New Orleans.

The next question is whether the board of levee commissioners can be called on by the plaintiff as the first body in the order of giving consent to the proposed erection of wharves, etc. The constitution is silent on that point, but logically the levee board could not give its consent until it should have first been finally ascertained by the legal body precisely where the works were to be placed and exactly what character of works they would be. The determination of these particular matters was not vested in it.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be, and the same is, hereby affirmed.

See dissenting opinion of BREAUX, J., 33 South. 396.

### On Rehearing.
#### (Jan. 19, 1903.)

PROVOSTY, J. The pleadings and the facts of this case are stated at length in the opinion heretofore handed down. In brief they are as follows:

Relators, the Illinois Central Railroad Company and the Mississippi Valley Railroad Company, are owners of six squares of ground bounding on the river in the city of New Orleans. They wish to construct wharves, docks, piers, bulkheads, and other improvements on their said front as terminal

facilities for their railroads. By article 290 of the constitution of the state they are required to obtain the consent of the city council, or other governing authority, and of the levee board, within whose jurisdiction the property is situated. They have obtained the consent of the city council and have applied to the levee board; and the latter board has refused to entertain the application, for the double reason—First, that its own action must come subsequent to, and not previous to, the action of the other authority whose consent must be obtained; and, second, that this other authority is not the council, but is the board of commissioners of the port of New Orleans. The relators ask for a mandamus compelling the levee board to act definitely in the matter, either giving or refusing its consent. The board of commissioners of the port of New Orleans, commonly known as the "Dock Board," and the city of New Orleans, have intervened in the suit to vindicate, respectively, their jurisdiction in the premises; and the controversy is now waged by the dock board on the one side and the relators and the city of New Orleans on the other side.

The first of the above-mentioned reasons assigned by the levee board for its nonaction need not be considered, since upon consideration of the second reason the court has found that the city council was the proper authority to be applied to for the consent in question.

Before the adoption of article 290, riparian owners wishing to build wharves did not have to obtain the consent of the public authorities; but the wharves were removable at the discretion of the public authorities, whenever the public exigencies required, without formal expropriation and without compensation. It was to change this order of things, and provide a more reliable tenure for private wharves, that article 290 was adopted.

The article reads as follows:

"Art. 290. Riparian owners of property on navigable rivers, lakes and streams, within any city or town in this state having a population in excess of five thousand, shall have the right to erect and maintain on the batture or banks owned by them such wharves, buildings and improvements as may be required for the purposes of commerce and navigation, subject to the following conditions, and not otherwise, to wit: Such owners shall first obtain the consent of the council, or other governing authority, and of the board of levee commissioners, within whose municipal or levee district jurisdiction such wharves, buildings and improvements are to be erected, and, such consent having been obtained, shall erect the same in conformity to plans and specifications which shall have been first submitted to, and approved by, the engineer of such council, or other governing authority; and when so erected, such wharves, buildings and improvements shall be, and remain, subject to the administration and control of such council or other governing authority with respect to their maintenance and to the fees and charges to be exacted for their use by the public whenever any fee or charge is authorized to be and is made, and shall be and remain subject to the control of such board of levee commissioners in so far as may be necessary for the maintenance and administration of the levees in its jurisdiction. The council, or other governing authority, shall have the right to expropriate such wharves, buildings and improvements, whenever necessary for public purposes, upon reimbursing the owner the cost of construction, less such depreciation as may have resulted from time and decay; such reimbursement, however, in no case to exceed the actual market value of the property: provided, that nothing in this article shall be construed as affecting the right of the state, or of any political subdivision thereof, or of the several boards of levee commissioners to appropriate without compensation such wharves, buildings and improvements, when necessary for levee purposes.

"The grants made by the city of New Orleans under the terms of Ordinance 11,765, Council Series, adopted January 14, 1896, authorizing the construction, use and maintenance of wharves, structures and improvements upon certain riparian property in the Sixth municipal district, and other grants of the same nature made by the city of New Orleans to riparian owners with reference to their property, are recognized as necessary aids to the commerce of this state, and are hereby ratified and declared to be lawful, but shall in no event be construed as conferring

greater privileges than might be conferred under this article, or as releasing the riparian owners from the obligations herein imposed, or which may have been imposed, upon or assumed by such riparian owner by contract, municipal ordinance or otherwise."

Under the order of things to be established by this article, the wharves were no longer to be removable without regular expropriation and compensation; but, in return, the plans and specifications for their construction would have to be submitted to the public authorities for approval, and the consent of these authorities would have to be obtained, and the structures would remain subject to the administration and control of the authorities with respect to their maintenance and the fees and charges to be exacted for their use by the public. Obviously, and we imagine that as to this there can be no dispute, the purpose of requiring the public authorities to be consulted and their consent to be obtained was to safeguard the public interest under the new order of things.· This being the case, it would seem reasonable to assume that the authority charged with the care of the particular public interest most likely to be prejudicially affected by the proposed constructions would be the authority required to be consulted; and the problem of ascertaining what authority is required to be consulted would seem to resolve itself into ascertaining what is the particular public interest most likely to be prejudicially affected, and what is the authority in charge of it.

The problem is not difficult of solution. Plainly, no other public interest is involved than that connected with the use of the river front of the city; and while the public uses of this river front are various, the use for levees and the use for the port of New Orleans are so paramount that all others dwindle into insignificance and need not be considered. The levee board and the authority in charge of the interest of the port of New Orleans are, then, the authorities to be consulted.

Authority over the public interests connected with the port of New Orleans is vested primarily in the legislature. This is not contested, and is incontestable. State v. City of New Orleans, 41 La. Ann. 156, 6 South. 592; Duffy v. City of New Orleans, 49 La.

Ann. 114, 21 South. 179; State v. Flower, 49 La. Ann. 1199, 22 South. 623. To what subordinate agencies the legislature has delegated the authority is the question. We find that by Act No. 70 of 1896 and Act No. 36 of 1900 the legislature has delegated the authority in its plenitude to the dock board, save and except, however, in connection with private wharves. Act No. 70 of 1896 contains the following proviso: "Provided, that nothing in this act shall apply to wharves owned by riparian proprietors, whether individuals, firms or corporations, and maintained and used by the owner or owners or their lessees."

Act 36 of 1900 contains the following proviso:

"Provided, nothing in this act shall apply to wharves owned by riparian proprietors, already constructed or hereafter constructed, in accordance with the provisions of article 290 of the constitution, whether individuals, firms or corporations, and maintained and used by the owner or owners or lessees."

No one can, or does, pretend that the dock board has any powers outside of these two acts, and the provisos explicitly declare that nothing in the acts contained shall apply to these private wharves. The conclusion, then, is irresistible that the dock board has no jurisdiction over the matter of these wharves.

A recognized effect and operation of a proviso is to deny or prohibit; and when connected with a delegation of authority, as in this case, it is tantamount to a command not to exercise the authority. In the case of Voorhies v. Jackson, 35 U. S. 473, 9 L. Ed. 490, the supreme court of the United States defined a proviso as "a limitation or exception to a grant made or authority conferred, the effect of which is to declare that the one shall not operate, or the other be exercised, unless in the case provided." For further authorities on the same subject see Sedg. St. Const. Law, p. 49; Commissioners v. Keith, 2 Pa. 218; Bloodgood v. Railroad Co., 18 Wend. 9, 31 Am. Dec. 313.

The dock board not having jurisdiction, the city council has; for no one pretends otherwise than that the jurisdiction is vested in one or the other of the two bodies.

The dock board is charged with the duty to build additional public wharves as the exigencies of the port shall require. The construction of private wharves at the places

where it might be desired to build public wharves might block the performance of this duty. From the inconvenience or conflict of authority which might thus result, it is argued that the dock board, and not the council, must be the authority to be consulted in the matter of these private wharves. The argument addresses itself to the legislature, and not to this court. If this serious detriment to the public interest is likely to result, there is excellent reason for the legislature to recall the provisos quoted above; but there is not sufficient reason for this court to hold that the dock board has a power which not only has not been delegated to it, but has been expressly withheld from it.

It may be well to add that the court does not agree with the view that article 290 restricts to the city council the jurisdiction over the matter of the giving of this consent to riparian owners. If the article did, the legislature would be powerless to transfer the jurisdiction to any other functionary, and the result would be that the supreme authority over the public servitude on the banks of the rivers, lodged in the legislature from the foundation of the government, would have been to that extent taken away from the legislature and vested directly in the city councils. To that extent a change would have been made in the organic law, and a new limitation placed on the powers of the legislature. The framers of article 290 had no intention to operate such a divestiture and investiture. Evidently they were legislating solely with a view to providing a more reliable tenure for the wharves of riparian owners, and at the same time to protecting the public interest, and were not aiming at taking away any jurisdiction theretofore enjoyed by the legislature. Those purposes were fully and completely accomplished by letting the authority be exercised by whatever functionary the legislature had theretofore delegated it to or might thereafter delegate it to.

This change in the organic law, this placing of a new limitation upon the powers of the legislature, must result, if at all, by implication from the meaning of the word "municipal," made use of in article 290 to qualify the jurisdiction of the authority whose consent is to be obtained. Much of the argument in support of this change is devoted to showing that the dock board is not a municipal corporation. Granting that it is not, the conclusion does not follow that it does not exercise a municipal jurisdiction. Municipal courts exercise municipal jurisdiction, but they are not municipal corporations. The different public boards which administer in part the affairs of the city of New Orleans—the school board, the board of police commissioners, the board of fire commissioners, the drainage board, the sewerage and water board, the civil service commission, the board of health, and the board of liquidation of the city debt—exercise a municipal jurisdiction, and yet they would hardly be called municipal corporations. We imagine it would be unsafe to predicate a decision upon the fact that these boards were not exercising a municipal jurisdiction.

It is also said that "municipal" is the adjective of "municipality," meaning "pertaining to a municipality." This is true; but between the noun and the adjective there is the difference that, while the noun names the thing, the adjective merely describes a relation to the thing. In a thing there are no degrees; in a relation there are. The relation may be more or less close or complete. The adjective "municipal" is much more elastic in its meaning than is the word "municipality," or even than the term "municipal corporation."

Nothing is better settled than that police juries are not municipal corporations, within the strict meaning of that term, and yet this court in any number of instances has called them municipal corporations, simply because they are public corporations, and all public corporations are municipal corporations, as contradistinguished from private corporations. Parker v. Scogin, 11 La. Ann. 629; Droz v. Parish of East Baton Rouge, 36 La. Ann. 307; Hoffpauir v. Wise, 38 La. Ann. 704; Dill. Mun. Corp. (3d Ed.) § 23, draws the distinction sharply between municipal corporations proper and counties; nevertheless he, in the same paragraph, calls the latter "municipal organizations." The jurisdiction of a police jury is a municipal jurisdiction, although a police jury is not a municipal corporation properly speaking.

In Horton v. Commissioners, 43 Ala. 598, it was held that a repealing clause, worded as follows: "That all laws or parts of laws,

of a general or special character, except those enacted for municipal purposes, upon the subject of taxation in this state, be and the same are hereby repealed,"—did not repeal an act creating a board of school directors for the city of Mobile and requiring certain taxes to be imposed and collected and paid over to it. In discussing the case the court used the following language: "The word 'municipal' has no well-defined technical meaning, nor does the language of the revenue act seem to confine its import to any very narrow bounds. It is evidently used in a general, and not in a particular, sense. The legislature was aware that it did not apply solely to incorporated towns or cities, but that it was equally applicable to incorporated bodies organized for the accomplishment of great and important public purposes, which, for the sake of uniformity and successful administration, needed a corporate body and special laws for its management. 'Municipal' has been defined to be that which belongs to a corporation or a city, and to include the rules or laws by which a particular district, community, or nation is governed. It may also mean 'local, particular, independent.' "

In the case of Society v. Houseman, 81 Mich. 609, 46 N. W. 15, it was held that the constitutional provision that "no corporation, except for municipal purposes, or for the construction of railroads, plank roads, and canals, shall be created for a longer time than thirty years," did not apply to a corporation created for the declared object of promoting agriculture and its kindred arts; this corporation being a corporation for municipal purposes and within the exception of the constitution. The court said: "The authorities are numerous that the word 'municipal' has not a well-defined and technical meaning, and must be construed with reference to the evils to be prevented and the purposes to be accomplished, the history of the provision of the constitution in which it is used, and the practical construction that has been placed upon it."

In Canadian Pac. R. Co. v. City of Winnipeg, 30 Can. Sup. Ct. 558, a state by-law exempted a railroad corporation from "all municipal taxes, rates and levies, and assessments of every nature and kind." The court held that this exemption applied to school

taxes. The court said: "But we much prefer to rest our judgment upon the main ground that municipal taxes include school taxes."

In State v. Hellman, 56 Conn. 190, 14 Atl. 806, it was held that a statute providing that "the towns or the municipal authorities of any city, borough or town may fix the time for closing at any hour not later than 12 o'clock at night," did not necessarily apply to the common council alone of a town, but applied also to the selectmen of the town, and "that the term 'municipal authorities' may be reasonably applied to the selectmen, who are agents of the town or municipality."

These decisions show that the phrase "municipal jurisdiction" does not necessarily designate the jurisdiction of a common council, but may designate the jurisdiction of any public authority administering a business pertaining to a city, such as would have to be administered by the common council of the city in the absence of such specially constituted authority. One can draw the line with some certainty between what is and is not a municipality; but we imagine it would not be so easy to fix the boundary line between a jurisdiction that is municipal and one that is not. In order to exercise a municipal jurisdiction, it is not indispensable to be a municipal corporation. It suffices to be given authority over a business pertaining to a municipal corporation. The public wharves of the city of New Orleans are within the municipal jurisdiction of the dock board, and these private wharves would also be, if it were not that the legislature has otherwise provided.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that the mandamus prayed for be made peremptory; the board of commissioners of the Orleans levee district to pay the costs of the lower court, except those of the intervention of the board of commissioners of the port of New Orleans, which are to be paid by the latter board, and the costs of appeal to be paid by the said boards, one-half by each.

NICHOLLS, C. J., dissents, reserving the right to file his reasons hereafter. MONROE, J., dissents.